No. 21-1770

# United States Court of Appeals
## for the First Circuit

HUNTER HARRIS AND CORA CLUETT,

*Plaintiffs-Appellants,*

*v.*

UNIVERSITY OF MASSACHUSETTS LOWELL, JACQUELINE MOLONEY, UNIVERSITY OF MASSACHUSETTS BOSTON, MARCELO SUÁREZ-OROZCO, AND SHAWN DE VEAU,

*Defendants-Appellees.*

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

## BRIEF OF DEFENDANTS-APPELLEES

MAURA HEALEY
   *Attorney General of Massachusetts*
Richard S. Weitzel, 1st Cir. No. 54006
Christine Fimognari, 1st Cir. No. 1198115
   *Assistant Attorneys General*
Government Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2022
Richard.Weitzel@mass.gov
Christine.Fimognari@mass.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

JURISDICTIONAL STATEMENT ......................................................................1

QUESTIONS PRESENTED...................................................................................2

STATEMENT OF THE CASE................................................................................3

STATEMENT OF FACTS .....................................................................................4

    1. The COVID-19 Pandemic ......................................................................4

    2. COVID-19 Risks Associated with University Settings .............................5

    3. COVID-19 Vaccines ...............................................................................6

    4. The University ........................................................................................10

    5. The University's Vaccine Requirement .....................................................11

    6. Students ...............................................................................................13

STATEMENT OF PROCEEDINGS BELOW .......................................................15

SUMMARY OF THE ARGUMENT ......................................................................18

ARGUMENT ........................................................................................................19

    I.    THE DISTRICT COURT PROPERLY DISMISSED
          STUDENTS' SUBSTANTIVE DUE PROCESS CHALLENGE
          TO THE UNIVERSITY'S VACCINE REQUIREMENT..................19

          A.    Courts Have Uniformly Affirmed the Constitutionality of
                Vaccine Requirements, From Smallpox to COVID-19............20

          B.    The Substantive Due Process Framework Compels
                Rejection of the Students' Challenge to the Vaccine
                Requirement. ...........................................................................24

1. The Vaccine Requirement Does Not Implicate a Fundamental Right...................................................25

2. The Vaccine Requirement Easily Satisfies Rational Basis Review ...............................................28

C. The Students' Efforts to Distinguish this Case from *Jacobson* are Unavailing.........................................31

II. THE DISTRICT COURT PROPERLY HELD THAT CLUETT FAILED TO STATE A FIRST AMENDMENT FREE EXERCISE CLAIM BASED ON THE DENIAL OF HER RELIGIOUS EXEMPTION REQUEST............................................37

A. The Complaint on its Face Fails to State a First Amendment Claim. ...............................................38

B. Even Considering Certain Documents Discussed in the Complaint, the Students Fail to State a First Amendment Claim. ..................................................42

1. The University Engaged in a Standard Interactive Process, Focused on Whether Cluett Had a Sincerely Held Religious Belief That Prevented Her From Receiving the COVID-19 Vaccine. ..................................................42

2. Vice Chancellor De Veau's Questions and Observations Regarding the Catholic Church Do Not Give Rise to a First Amendment Claim.................................................45

C. This Court Should Not Consider the Students' First Amendment Arguments Raised for the First Time on Appeal. ..................................................50

III. THE DISTRICT COURT'S DENIAL OF THE STUDENTS' PRELIMINARY INJUNCTION MOTION SHOULD NOT BE REVIEWED OR REVERSED.........................................52

CONCLUSION ..............................................................54

# TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis*, 6 F.4th 1160 (10th Cir. 2021) ....................................51

*A.C. Waithe v. McKee*, 23 F.4th 37 (1st Cir. 2022) ............................................28, 29

*Ackerman v. Washington,* 16 F. 4th 170 (6th Cir. 2021) .........................................49

*America's Frontline Doctors v. Wilcox*, 2021 WL 4546923
    (C.D. Cal. 2021)...............................................................................23

*Bauer v. Summey*, 2021 WL 4900922 (D.S.C. 2021)................................................31

*Bayley's Campground, Inc. v. Mills*, 985 F.3d 153
    (1st Cir. 2021) .................................................................................4

*Bridges v. Hous. Methodist Hosp.*, 543 F. Supp. 3d 525
    (S.D. Tex. 2021) ...............................................................................31

*Brnovich v. Biden*, 2022 WL 252396 (D. Ariz. 2022).............................................31

*Capriole v. Uber Technologies, Inc.*, 991 F.3d 339
    (1st Cir. 2021) ............................................................................1, 52

*Caviezel v. Great Neck Pub. Schs.*, 701 F. Supp. 2d 414
    (E.D.N.Y 2010)........................................................ 41-42, 44, 45, 49

*Check v. New York City Dep't of Educ.*, 2013 WL 2181045
    (E.D.N.Y. May 20, 2013) ...............................................................45

*Children's Health Defense v. Rutgers,* 2021 WL 4398743
    (D.N.J. 2021) .....................................................................................23

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993)..........................................................................41

*City of Boerne v. Flores*, 521 U.S. 507 (1997) .......................................................17

*Cruzan v. Director of Miss. Dept. of Public Health*,
497 U.S. 261 (1990)......................................................................26, 27

*Dalli v. Board of Education*, 358 Mass. 753,
267 N.E.2d 269 (1971) ............................................................................47

*Dixon v. De Blasio*, 2021 WL 4750187 (E.D.N.Y. 2021).......................................25

*Doe v. San Diego Unified School District*, 19 F.4th 1173
(9th Cir. 2021) ............................................................................23

*Does 1-6 v. Mills*, 16 F.4th 20 (1st Cir. 2021) ...................................................*passim*

*Doherty v. Merck & Co., Inc.,* 892 F.3d 493 (1st Cir. 2018)..................................29

*Donahue v. City of Boston*, 371 F.3d 7 (1st Cir. 2004) ...........................................28

*Employment Div., Dept. of Human Resources of Ore. v. Smith*,
494 U.S. 872 (1990)................................................................. 40-41

*EEOC v. Union Independiente de la Autoridad de Aceuductos y
Alcantarillados de P.R.*, 279 F.3d 49 (1st Cir. 2002)...................................45

*Farina v. Bd. of Educ. of New York*, 116 F. Supp. 2d 503
(S.D.N.Y. 2000)................................................................. 41-42

*F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307 (1993)...........................28, 35

*Friedman v. Clarkstown Cent. Sch. Dist.*, 75 F. App'x 815
(2d Cir. 2003)................................................................43, 48

*Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021)..............................50, 51, 52

*Garcia-Rubiera v. Fortuno,* 665 F.3d 261 (1st Cir. 2011) ....................................20

*Gent v. CUNA Mut. Ins. Society,* 611 F.3d 79 (1st Cir. 2010) ................................3

*Gold v. Sandoval*, 2021 WL 5762190 (D. Nev. 2021) ....................................23, 26

*Gonzalez-Fuentes v. Molina*, 607 F.3d 864 (1st Cir. 2010) ......................................24

*Haley v. City of Boston*, 657 F.3d 39 (1st Cir. 2011) ...................................3

*Harnois v. Univ. of Mass. at Dartmouth,* 2019 WL 4762604
    (D. Mass. 2019) ...............................................16

*Heller v. Doe*, 509 U.S. 312 (1990) ..........................................36

*Interport Pilots Agency Inc. v. Sammis*, 14 F.3d 133
    (2d Cir. 1994)...............................................20

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905) ...............................*passim*

*Johnson v. Brown*, 2021 WL 4846060 (D. Or. 2021).........................................23, 36

*Kheriaty v. Regents of the Univ. of Cal.*, 2021 WL 4714664
    (C.D. Cal. 2021)...........................................26, 27, 37

*Klaassen v. Trustees of Indiana University*, 2021 WL 3073926,
    (N.D. Ind. 2021) ("*Klaassen I*") ................................ 7-8, 26, 31, 35

*Klaassen v. Trustees of Indiana Univ.*, 7 F.4th 592
    (7th Cir. 2021) ("*Klaassen II*").............................8, 22, 23, 25, 29

*Klaassen v. Trustees of Indiana University*, 24 F.4th 638
    (7th Cir. 2022) ................................................8

*Larson v. Valente*, 456 U.S. 228 (1982) ...................................41

*LCM Enterprises, Inc. v. Dartmouth*, 14 F.3d 675
    (1st Cir. 1994)..............................................24

*Luke's Catering Service, LLC v. Cuomo*, 485 F. Supp. 3d 369,
    (W.D.N.Y. 2020) ...............................................33

*Martinez v. Cui*, 608 F.3d 54 (1st Cir. 2010).........................................28

*Mason v. General Brown Cent. Sch. Dist.*, 851 F.2d 47
(2d Cir. 1988)..............................................................................41, 44

*Mass. Correction Officers Federated Union v. Baker*,
2021 WL 4822154 (D. Mass. 2021) ...............................................25, 27

*Medeiros v. Vincent*, 431 F.3d 25 (1st Cir. 2005)..............................................24, 28

*Messina v. College of New Jersey*, 2021 WL 4786114
(D.N.J. 2021) ........................................................................23

*Morin v. MGH Inst. of Health Professions*, 2002 WL 31441509,
15 Mass. L. Rptr. 417 (Mass. Super. Ct. 2002)...............................................45

*Mulero-Carillo v. Roman-Hernandez*, 790 F.3d 99
(1st Cir. 2015) ......................................................................29

*Newman v. Lehman Bros. Holdings, Inc.*, 901 F.3d 19
(1st Cir. 2018) ....................................................................3, 39

*Nikolao v. Lyon*, 875 F.3d 310 (6th Cir. 2017) ........................................37

*NM v. Hebrew Acad. Long Beach*, 155 F. Supp. 3d 247
(E.D.N.Y. 2016)..............................................................41, 44, 45, 49

*Norris v. Stanley*, 2021 WL 4738827 (W.D. Mich. 2021) .............................*passim*

*O'Brien v. Mass. Bay Transp. Auth.*, 162 F.3d 40
(1st Cir. 1998) ......................................................................32

*Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008)........................................40

*Pennhurst State Sch. & Hosp. v. Halderman*,
465 U.S. 89 (1984)..................................................................32

*Perrier-Bilbo v. U.S.*, 954 F.3d 413, 429 (1st Cir. 2020) ......................................40

*Phillips v. City of New York*, 775 F.3d 538 (2d Cir. 2015)..........................22, 35, 37

*Prince v. Massachusetts*, 321 U.S. 158 (1944) ....................................................22, 37

*Professional Beauty Fed. of Cal. v. Newsom*,
2020 WL 3056126 (C.D. Cal. 2020) ........................................................33

*PZF Props, Inc. v. Rodriguez*, 928 F.2d 28 (1st Cir. 1991)...................................24

*Rocket Learning, Inc. v. Rivera-Sanchez*, 715 F.3d 1
(1st Cir. 2013) .................................................................39

*Rockwood v. SKF USA Inc.*, 687 F.3d 1 (1st Cir. 2012)...........................................51

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
141 S. Ct. 63 (2020).......................................................29

*Schweiker v. Wilson*, 450 U.S. 221 (1981) ................................................36

*Shaw v. Digital Equp. Corp.,* 82 F.3d 1194 (1st Cir. 1996) ...............................3, 42

*Sherr v. Northport-East Northport Union Free Sch. Dist.*,
672 F. Supp. 81 (E.D.N.Y. 1987)...................................................45

*Shurtleff v. City of Boston*, 986 F.3d 78 (1st Cir. 2021) ........................................53

*Starr Surplus Lines Ins. Co. v. Mountaire Farms, Inc.*,
920 F. 3d 111 (1st Cir. 2019).......................................................3

*Together Employees v. Mass. Gen. Brigham Inc.*,
2021 WL 5234394 (D. Mass. 2021) ........................................... 43, 44-45, 49

*Toledo v. Sanchez*, 454 F.3d 24 (1st Cir. 2006)......................................................29

*Troogstad v. City of Chicago*, 2021 WL 5505542
(N.D. Ill. 2021) ...................................................................23, 27

*United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224 (1973) ...............................20

*United States v. Seeger*, 380 U.S. 163 (1965).......................................................44

*U.S. v. Coplin*, 463 F.3d 96 (1st Cir. 2006) ......................................................20, 37

*U.S. v. Garcia*, 855 F.3d 615 (4th Cir. 2017) ..................................................... 3-4

*U.S. ex rel. Willette v. Univ. of Mass. Worcester*, 812 F.3d 35
    (1st Cir. 2016) .........................................................................................16

*Valdez v. Grisham*, 2021 WL 4145746 (D.N.M. 2021) ....................................31, 36

*Vazquez-Rivera v. Figueroa,* 759 F.3d 44 (1st Cir. 2014)......................................20

*V.D. v. State of New York*, 403 F.Supp.3d 76 (E.D.N.Y. 2019) ..............................22

*Vinning-El v. Evans*, 657 F.3d 591 (7th Cir. 2011) .................................................49

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ..............................................24, 26

*Washington v. Harper*, 494 U.S. 210 (1990) .....................................................26, 27

*W.B. v. Crossroads Academy-Central*, 2019 WL 6257963
    (W.D. Mo. 2019) ......................................................................................22

*We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266
    (2d Cir. 2021)..................................................................................*passim*

*Whitlow v. California,* 203 F.Supp.3d 1079 (S.D. Cal. 2016)..........................22, 37

*Workman v. Mingo County Bd. of Educ*, 419 F. App'x 348
    (4th Cir. 2011) ..............................................................................22, 25, 37

*Zucht v. King*, 260 U.S. 174 (1922) ........................................................................22

## **Statutes**

G.L. c. 75...............................................................................................................10

G.L. c. 75, § 1........................................................................................................32

G.L. c. 75, § 3A.................................................................................................32

G.L. c. 76, § 15.................................................................................................33

G.L. c. 76, § 15C...............................................................................................33

G.L. c. 111, § 181.............................................................................................33

28 U.S.C. § 1291(a)(1)........................................................................................1

28 U.S.C. § 1331.................................................................................................1

42 U.S.C. § 1983.........................................................................................15, 18

42 U.S.C. § 2000bb-1..................................................................................15, 17

21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III) ............................................................31

## Rules and Regulations

Fed. R. Civ. P. 12(b)(6)..............................................................................3, 16, 29

# JURISDICTIONAL STATEMENT

Defendants-Appellees (collectively, the "University" or "UMass") agree with the Jurisdictional Statement in the Brief of the Plaintiffs-Appellants ("Br.") insofar as it states that that the District Court had jurisdiction over Plaintiffs-Appellants' ("Students") federal claims under 28 U.S.C. § 1331 and that this Court has jurisdiction to review the District Court's dismissal of the Students' complaint under 28 U.S.C. § 1291(a)(1). However, because the District Court has issued a final judgment in this case, *see* Appendix ("App."), p. 4 (Docket No. 21), the University disagrees with the Students' position that this Court has jurisdiction to consider and "reverse" the District Court's denial of their motion for a preliminary injunction. *See* Br. 7-8, 20-22. On the contrary, "[i]t has long been the law that an appeal from the denial of a preliminary injunction motion becomes moot when final judgment issues because the district court's denial of the motion merges with the final judgment." *Capriole v. Uber Technologies, Inc.*, 991 F.3d 339, 343-44 (1st Cir. 2021) (dismissing appeal from denial of preliminary injunction "for lack of jurisdiction"). Accordingly, this Court does not have jurisdiction to review (or "reverse") the District Court's denial of the Students' motion for preliminary injunction. *Id.* (referring to the "jurisdictional question of mootness" in declining to consider denial of preliminary injunction motion).

## QUESTIONS PRESENTED

1.      Whether the Students have a fundamental right under the United States Constitution to refuse compliance with the University's COVID-19 vaccine requirement ("Vaccine Requirement") and attend classes and conduct other in-person activities on campus while unvaccinated.

2.      Whether the University's Vaccine Requirement is rationally related to the University's goal of reducing the spread of COVID-19 on its campuses, where federal and state public health authorities have declared COVID-19 vaccines to be safe and effective, and the federal Food and Drug Administration ("FDA") has fully approved the Pfizer and Moderna vaccines.

3.      Whether the University's denial of Appellant Cluett's request for a religious exemption to the COVID-19 Vaccine Requirement violated the Free Exercise Clause of the First Amendment, where the University was not constitutionally required to offer a religious exemption to the Vaccine Requirement in the first place; and where Cluett was subject to the interactive process afforded to all students by the University, which considered the sincerity of her stated religious opposition to vaccination based on her submissions, and afforded her the opportunity to provide a personal statement as proof of a sincerely held religious belief against vaccination.

<u>**STATEMENT OF THE CASE**</u>

As noted, the District Court's denial of the Students' motion for preliminary injunction is now moot due to the District Court's subsequent entry of a final judgment of dismissal. *See supra*, p. 1. Thus, the only issue properly on appeal is whether the District Court correctly allowed the University's motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6), which this Court reviews *de novo*. *See e.g., Newman v. Lehman Bros. Holdings, Inc.*, 901 F.3d 19, 24-25 (1st Cir. 2018). In describing the factual background of this matter below, therefore, the University will refer only to facts and documents that can properly be considered on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), including allegations in the Students' complaint, documents "integral or explicitly relied upon in the complaint, even though not attached to the complaint," *Shaw v. Digital Equp. Corp.,* 82 F.3d 1194, 1220 (1st Cir. 1996), matters of public record, and other facts susceptible to judicial notice, including information on certain government websites. *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011).[1]

---

[1] In particular, the University will refer to publicly available information about COVID-19 and the existing COVID-19 vaccines contained on the websites of (a) the Centers for Disease Control and Prevention ("CDC"), (b) the FDA, and (c) the Massachusetts Department of Public Health ("DPH"). *See Gent v. CUNA Mut. Ins. Society,* 611 F.3d 79, 84 n.5 (1st Cir. 2010) (taking judicial notice of "information that can be found on the CDC's website."); *Starr Surplus Lines Ins. Co. v. Mountaire Farms, Inc.*, 920 F. 3d 111, 115-16 (1st Cir. 2019) (considering information from CDC website in reviewing grant of motion to dismiss); *U.S. v.*

(footnote continued)

**Statement of Facts**

### 1. The COVID-19 Pandemic

COVID-19 is an "easily transmissible" and "unusually deadly" disease caused by SARS-CoV-2, the novel coronavirus that primarily spreads through respiratory droplets and aerosol transmission. *Bayley's Campground, Inc. v. Mills*, 985 F.3d 153, 160 (1st Cir. 2021).[2] People of all ages can contract and transmit COVID-19, and those who contract the disease may suffer severe illness or death, or incur long-term, ongoing health problems. App. 398-99. While COVID-19 tends to affect young people less severely, it can still cause severe illness and even death in this population. App. 399.

At the time of the District Court's decision, there had been approximately 35 million cases of COVID-19 in the United States and over 600,000 people had died from COVID-19 nationwide. App. 398. From February 2020 until August 14, 2021, Massachusetts had over 686,000 confirmed cases and 17,770 confirmed deaths from the disease. App. 398-99. After a decline in cases and hospitalizations in Massachusetts during the Spring of 2021, case and

---

*Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) ("This court and numerous others routinely take judicial notice of information contained on state and federal government websites.").

[2]     *See also* CDC, "How COVID-19 Spreads" (July 14, 2021) at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited February 25, 2022).

hospitalization numbers began to steadily rise again in July 2021 due to the

emergence of the highly contagious Delta variant. App. 399.[3]

Nationwide, persons between the ages of 18 and 29 have contracted

COVID-19 at a disproportionately high rate, accounting for 23% of all confirmed

COVID-19 cases at the time of the District Court's decision, with 2,870 deaths.

App. 29, ¶ 16.[4] Beginning in July 2021, with the onset of the Delta variant, the

number of 18- to 29-year-olds hospitalized with a confirmed case of COVID-19

rose substantially, and have recently skyrocketed with the rise of the Omicron

variant.[5]

### 2. COVID-19 Risks Associated with University Settings

Per the CDC, "[p]eople living and working in congregate settings, including

[institutions of higher learning], are at increased risk of spreading SARS-CoV-2

---

[3]    *See also* DPH "COVID-19 Interactive Data Dashboard" at
https://www.mass.gov/info-details/covid-19-response-reporting#covid-19-interactive-data-dashboard-.47 ("COVID-19 Cases" and "Hospitalizations") (last visited February 25, 2022).

[4]    *See also* CDC, "Demographic Trends of COVID-19 Cases and Deaths in the US reported to CDC" at https://covid.cdc.gov/covid-data-tracker/#demographics (last visited February 25, 2022).

[5]    *See* CDC Data Tracker, "New Hospital Admissions" at
https://covid.cdc.gov/covid-data-tracker/#new-hospital-admissions (last visited February 25, 2022).

infection."[6]  In light of this, the CDC has provided extensive COVID-related "Guidance for Institutions of Higher Education," which, *inter alia*, encourages such institutions to offer and promote COVID-19 vaccination among students, faculty, and staff.[7]  The threat posed by COVID-19 in college settings extends not only to students, of course, but also to faculty and staff who occupy an older age demographic that is at higher risk for severe disease from contracting COVID-19.[8] In addition, the CDC has published data indicating that COVID-19 infections among students attending college are potential drivers of infection in the larger community.[9]

### 3.    COVID-19 Vaccines

There are three COVID-19 vaccinations available in the United States: the Pfizer BioNTech mRNA vaccine, the Moderna mRNA vaccine, and the

---

[6]      *See* CDC, "Guidance for Institutions of Higher Education (IHEs)" (updated to include recommendation regarding vaccines on June 4, 2021) at https://www.cdc.gov/coronavirus/2019-ncov/community/colleges-universities/considerations.html#section4.

[7]      *Id.*

[8]      *See* CDC, "COVID-19:  People with Certain Medical Conditions" (updated February 15, 2022) at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited at February 25, 2022).

[9]      *See* CDC Morbidity and Mortality Weekly Report (January 8, 2021) at https://www.cdc.gov/mmwr/volumes/70/wr/mm7001a4.htm

Johnson/Janssen viral vector vaccine ("COVID Vaccines"). App. 11, 400. When the Students filed their Complaint, all three COVID Vaccines were approved by the FDA under an Emergency Use Authorization ("EUA"), an approval method used during public health emergencies. *Id.* Prior to receiving EUA approval, the COVID Vaccines underwent multi-phase clinical trials for safety and efficacy — "a rigorous development process that include[d] tens of thousands of study participants to generate the needed non-clinical, clinical, and manufacturing data."[10] "Because of the widespread use of a COVID-19 vaccine, the FDA informed manufacturers that it expected the same level of endpoint efficiency data as required for full approval, enough safety data to justify by clear and compelling evidence the vaccine's safety, and confirmation of the technical procedures and verification steps necessary to support full approval." *Klaassen v. Trustees of*

---

[10]     *See* FDA, "Emergency Use Authorization for Vaccines Explained" at https://www.fda.gov/vaccines-blood-biologics/vaccines/emergency-use-authorization-vaccines-explained (last visited at February 25, 2022).

*Indiana University*, 2021 WL 3073926, \*8 (N.D. Ind. 2021) ("*Klaassen I*").[11, 12]

On August 23, 2021, prior to the District Court's decision, the Pfizer BioNTech COVID vaccine received full FDA approval for individuals 16 years of age and older.  App. 114-20.  On January 31, 2022, the Moderna COVID vaccine also received full FDA approval for individuals 18 years of age and older.[13]

Both the CDC and the Massachusetts Department of Public Health ("DPH") deem the COVID vaccines to be "safe and effective" and consider widespread vaccination to be the best strategy for ending the COVID-19 pandemic by limiting

---

[11]  The District Court in *Klaassen I* denied plaintiffs' preliminary injunction motion, and the Seventh Circuit subsequently issued an opinion denying plaintiffs' request for an injunction pending appeal.  *See Klaassen v. Trustees of Indiana Univ*., 7 F.4th 592 (7th Cir. 2021) ("*Klaassen II*") (discussed *infra*, pp. 22-23, 25).  Thereafter, on August 12, 2021, the Supreme Court (Barrett, J.) also denied plaintiffs' request for an injunction pending appeal.  *See Klaassen v. Trustees of Indiana University*, S. Ct. Docket No. 21A15.  The Seventh Circuit then later technically vacated *Klaassen I* on the grounds that the case was moot.  24 F.4th 638 (7th Cir. 2022).

[12]  *See also* "Emergency Use Authorization for Vaccines to Prevent COVID-19: Guidance for Industry" (dated May 25, 2021) at https://www.fda.gov/media/142749/download

[13]  *See* FDA, "FDA Takes Key Action by Approving Second COVID-19 Vaccine" (January 31, 2022) at https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/spikevax-and-moderna-covid-19-vaccine

the spread of the virus.[14]  "The COVID-19 vaccines protect against infection and lower the risk of adverse health consequences, including death, should a vaccinated person become infected.  Vaccination also reduces a person's risk of transmitting COVID-19 to others."  *Does 1-6 v. Mills*, 16 F.4th 20, 33 (1st Cir. 2021).[15]  While the recent Delta and Omicron variants have led to an increase in "breakthrough" cases (where a vaccinated person becomes infected), the vaccines remain "effective at preventing severe illness, hospitalizations, and death" even in the face of these variants.[16]  At the time of the District Court's decision below, over 375 million doses of the COVID vaccines had been administered in the United States — a number that now stands at approximately 552 million as of February 25, 2022.  App. 401.[17]

---

[14]    *See* CDC, "Benefits of Getting a COVID-19 Vaccine" (updated January 11, 2022) at https://www.cdc.gov/coronavirus/2019-ncov/vaccines/vaccine-benefits.html; DPH, "Trust the Facts, Get the Vax" at https://www.mass.gov/info-details/trust-the-facts-get-the-vax (last visited February 25, 2022).

[15]    *See also* CDC, "Benefits of Getting a COVID-19 Vaccine" (updated January 11, 2022) at https://www.cdc.gov/coronavirus/2019-ncov/vaccines/vaccine-benefits.html

[16]    *See* CDC, "About Variants"  at https://www.cdc.gov/coronavirus/2019-ncov/variants/about-variants.html (last visited on February 25, 2022).

[17]    *See* CDC, "Trends in Number of COVID-19 Vaccinations in the U.S." at https://covid.cdc.gov/covid-data-tracker/#vaccination-trends_vacctrends-total-cum (last visited February 25, 2022).

### 4. <u>The University</u>

The University of Massachusetts is a public research university created under Mass. Gen. Laws ch. 75, with four undergraduate and graduate campuses, including Defendants-Appellees UMass Lowell and UMass Boston, as well as a medical school.  App. 8.  As of the Fall 2020, 75,000 students attended the University, with approximately 18,390 students enrolled at UMass Lowell and 16,250 students enrolled at UMass Boston.[18]  Both UMass Boston and UMass Lowell have residence and dining halls where students live and eat together on campus.[19]

Defendant-Appellee Jacqueline Moloney is the Chancellor of UMass Lowell.  App. 8.  Defendant-Appellee Marcelo Suárez-Orozco is the Chancellor of UMass Boston and Defendant-Appellee Shawn De Veau is the Interim Vice Chancellor of Student Affairs at that campus.  App. 9.

---

[18]   *See* UMass, "Quick Facts" at https://www.massachusetts.edu/about/quick-facts (last visited February 25, 2022).

[19]   *See* UMass Lowell, "Residence Halls" and "University Dining" at https://www.uml.edu/student-services/reslife/residence-halls/ and https://www.uml.edu/student-services/reslife/University-Dining.aspx (last visited February 25 2022); UMass Boston, "Housing" and "Campus Center" at https://www.umb.edu/housing/on_campus and https://www.umb.edu/campus_center/services/dining (last visited February 25, 2022).

### 5.    The University's Vaccine Requirement

On April 26, 2021, UMass Boston announced that it would require all students to be fully vaccinated against COVID-19 prior to the beginning of the fall semester in order to "live, learn and/or conduct research on campus." App. 10.[20] The announcement stated that the Vaccine Requirement was "a key component in [UMass Boston's] eventual return to campus" as "vaccination is the most effective way to stop the spread of the virus." *Id.* UMass Boston further stated that it would "accommodate medical, disability and religious exemptions" in administering the Vaccine Requirement. *Id.*

On April 28, 2021, UMass Lowell similarly announced that all students wishing to come to campus or physically access campus resources for the fall semester would need to be fully vaccinated. App. 9.[21] The announcement stated that the Vaccine Requirement was "the most effective tool to return to the vibrant, dynamic and interpersonal pre-pandemic campus life that so many of us are eager to create" and that the University was "making this decision based on widely anticipated additional state and federal public health guidelines in the coming

---

[20]    *See also* "An Update on Vaccinations for the UMass Boston Community" (April 26, 2021) at https://www.umb.edu/news/detail/an_update_on_vaccinations_for_the_umass_boston_community

[21]    Joseph Hartman, *UMass Lowell to Require Student COVID-19 Vaccinations for Fall* (Apr. 28, 2021), www.uml.edu/alert/coronavirus/4-27-21-student-vaccine-requirement.aspx..

months as well as ample vaccine availability at vaccination sites across Massachusetts and throughout the country." *Id*. UMass Lowell further announced that, in implementing the Vaccine Requirement, it "will accommodate medical, disability and religious exemptions consistent with state and federal laws." *Id*. UMass Amherst and UMass Dartmouth also announced identical vaccination requirements for their undergraduate and graduate students during this same time period.[22]

UMass students who opt not to be vaccinated against COVID-19 remain enrolled and may still take classes online where available. App. 405; Br. 2. Thus, as the District Court observed, "students will not face expulsion for failing to comply" with the Vaccine Requirement. App. 405.

At the time the University put in place its Vaccine Requirement for students in April 2021, it did not require that all faculty and staff also be vaccinated. App. 9-10. However, after engaging in negotiations with various unions representing University employees, UMass Boston and UMass Lowell (and other University campuses) publicly announced that all employees working on campus are required

---

[22]   *See* "A Message from Chancellor Subbaswamy about Fall Operating Plans" dated April 22, 2021 at https://www.umass.edu/chancellor/message-chancellor-subbaswamy-about-fall-operating-plans; "Updates on vaccinations and on-campus testing" dated April 30, 2021 at https://www.umassd.edu/news/2021/updates-vaccinations-on-campus-testing-fall-2021.html.

to be vaccinated against COVID-19, subject to eligibility for medical or religious exemptions.[23]

### 6. Students

Hunter Harris is a resident of Medway, Massachusetts and was an incoming Junior enrolled at UMass Lowell at the time the Complaint was filed. App. 8, 16. Harris alleges that he has not taken the COVID-19 vaccine and that he does not qualify for either a medical or religious exemption to the Vaccine Requirement. App. 16. Harris has advised this Court that he currently attends school at the University of South Carolina. Br. 7.

Cora Cluett is a resident of Quincy, Massachusetts and was an incoming senior enrolled at UMass Boston at the time the Complaint was filed. App. 8. Cluett has also declined to receive the COVID-19 vaccine, and she is currently taking courses remotely at UMass Boston. App. 16; Br. 7.

---

[23] *See* UMass Lowell and University Unions Partner on COVID-19 Vaccination Requirement (August 24, 2021) at https://www.uml.edu/news/press-releases/2021/employeevaxrelease082421.aspx; UMass Amherst "Campus Vaccine Agreements" at https://www.umass.edu/humres/campus-vaccine-agreements; UMass Lowell "COVID-19 Vaccine FAQ" (last visited on February 25, 2022) at https://www.uml.edu/alert/coronavirus/returning/covid-vaccine-faq.aspx#answer338197_9; UMass Boston "COVID-19 Policies" (last updated January 2022) at https://www.umb.edu/coronavirus/covid_19_university_policy; UMass Amherst Human Resources bulletin (last updated January 2022) at https://www.umass.edu/humres/spring-2022; UMass Dartmouth "Vaccine Information" (last visited on February 25, 2022) at https://www.umassd.edu/covid/vaccine/.

On May 18, 2021, Cluett submitted a religious exemption request to UMass Boston. App. 20. On June 23, 2021, she submitted a written statement in support of her request, and received a reply later that day informing her that a committee would review her request. *Id.* On July 15, 2021, UMass Boston notified Cluett that her initial request was not approved and directed her to send any appeal to Chancellor De Veau. *Id.* On July 21, 2021, Cluett sought clarification from UMass Boston as to why her request was denied, to which De Veau responded, telling Cluett that in her appeal she should provide "[p]roof of a sincerely held religious belief," in the form of either "(1) A signed statement from a religious official describing the religious tenet that precludes the taking of a vaccine and/or (2) A personally written statement describing the religious basis for [her] objection to taking this vaccine versus the other vaccines which [she] previously submitted evidence of having received." App. 105-06, 349-51. On July 23, 2021, Cluett sent a letter appealing the initial decision. App. 21. On July 26, 2021, De Veau wrote to Cluett that her appeal was denied, since he understood from the substance of her request that she was Roman Catholic, and concluded from public statements of Catholic Church leaders that the COVID-19 vaccine would not violate tenets of that faith. App. 21. In interpreting Cluett's faith to be Roman Catholic, De Veau told Cluett "[i]f this is incorrect, please let me know." App. 111, 348. De Veau then cited statements from the United States Conference of Catholic Bishops and

14

the Vatican COVID-19 Commission that endorsed administration of the COVID-19 vaccines. *Id.* Based on this information, De Veau concluded that he was not aware of any religious tenets that would prevent someone of the Roman Catholic faith from receiving a vaccine. *Id.* On this basis and without further documentation or information from Cluett indicating such a religious tenet, De Veau denied Cluett's appeal. *Id.*

## Statement of Proceedings Below

On July 30, 2021, the Students filed a four-count "Verified Complaint for Declaratory and Injunctive Relief" challenging the University's Vaccine Requirement. App. 8-26. In Count I, the Students alleged that the Vaccine Requirement violated the procedural component of the Fourteenth Amendment's Due Process Clause. App. 16-17. In Count II, they alleged that the Vaccine Requirement violated the substantive component of the Due Process Clause. App. 17-20. In Count III, Cluett alleged that the University, by denying her request for a religious exemption, "burden[ed] [her] free exercise of her religion" in violation of (a) the First and Fourteenth Amendments, (b) the federal Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §2000bb-1, and (c) her rights under "Articles I and II of the Massachusetts Constitution." App. 20-22. Lastly, in Count IV, the Students brought a claim under 42 U.S.C. § 1983, alleging that the various violations of law described in Counts I-III also violated Section 1983.

App. 22.  As relief, the Complaint requested (1) a "[d]eclaration that defendants'

vaccination mandates are unconstitutional on its [*sic*] face"; (2) a "[d]eclaration

that defendants' mandates are unconstitutional as applied to each respective

plaintiff"; (3) that the District Court "enjoin defendants from enforcing their

mandate"; and (4) attorney fees and costs, "plus any other relief this Court deems

proper."  App. 22-23.

The Students filed a motion for preliminary injunction simultaneously with

their Complaint, seeking to enjoin enforcement of the Vaccine Requirement.  App.

389-90.  On August 17, 2021, the University filed an opposition to the motion for

preliminary injunction, accompanied by a motion to dismiss the Complaint in its

entirety.  App. 3.  In their motion to dismiss, the University argued that all of the

federal claims were deficient as a matter of law under Fed. R. Civ. P. 12(b)(6), and

that the claims brought under state law and/or specifically against UMass Boston

and UMass Lowell (as state agencies)[24] were barred by the Eleventh Amendment.

App. 391-92.

Following a hearing, the District Court issued a memorandum and order on

August 27, 2021, that denied the Students' motion for a preliminary injunction and

---

[24]     The University of Massachusetts is considered an "arm of the state," *U.S. ex
rel. Willette v. Univ. of Mass. Worcester*, 812 F.3d 35, 40 (1st Cir. 2016), and
therefore enjoys Eleventh Amendment immunity.  *See, e.g., Harnois v. Univ. of
Mass. at Dartmouth,* 2019 WL 4762604, *2 (D. Mass. 2019).

allowed the University's motion to dismiss.  App. 4, 395-411.  As a threshold

matter, the District Court dismissed all claims against UMass Lowell and UMass

Boston as barred by the Eleventh Amendment.  App. 405.  The Court then

dismissed the Students' procedural due process claims (Count I), ruling that

because the Vaccine Requirement was a prospective rule of general application,

the Students were not entitled to process beyond the notice provided by the

enactment and publication of the Vaccine Requirement itself.  App. 406.  With

respect to the Students' substantive due process claims (Count II), the Court

concluded that the Vaccine Requirement did not implicate a "fundamental right

protected by the Due Process Clause" and was, therefore, subject only to rational-

basis review, which it readily satisfied.  App. 407-08.  As for Cluett's claims

relating to the denial of her request for a religious exemption (Count III), the

District Court first ruled that (a) any claims under Massachusetts statutory or

constitutional law were barred by the Eleventh Amendment and (b) her claim

under 42 U.S.C. § 2000bb-1 was invalid because "RFRA cannot be applied to

states or an arm of the state like UMass."  AR. 409-10 (citing *City of Boerne v.

Flores*, 521 U.S. 507, 532-36 (1997)).  The Court then ruled that Cluett's First

Amendment Free Exercise claim was subject to dismissal because the University

was under no constitutional obligation to offer a religious exemption to the

Vaccine Requirement, and while the University could not administer the

17

exemption process in a manner that was itself unconstitutional, the Students had not alleged facts indicating that this was occurring. App. 410. Finally, the District Court dismissed the Students' 42 U.S.C. § 1983 claims (Count IV) as duplicative and derivative of the other counts. App. 410 n.8. In accordance with this decision, on August 27, 2021, the District Court entered a judgment for the University on all counts of the Complaint. App. 4.

On appeal, the Students challenge the District Court's rulings only as they relate to Counts II and III, the substantive due process and Cluett's free exercise claims, respectively. Br. 1, 9-20.

## SUMMARY OF THE ARGUMENT

The Students' contention that the Vaccine Requirement violates the substantive component of the Fourteenth Amendment's Due Process Clause fails as a matter of law. For over 100 years, the Supreme Court and lower federal courts have upheld the right of state and local actors to impose vaccine mandates as a means of limiting the spread of contagious diseases within their communities. Consistent with this legal tradition, numerous courts, including this Court, have specifically turned away constitutional challenges to COVID-19 Vaccine mandates, including those instituted by public universities. Here, applying the conventional framework for analyzing substantive due process claims, the Students do not have a fundamental right to be present on the University's campuses in

defiance of a vaccine requirement, notwithstanding their mischaracterization of the requirement as "forced medical treatment." Because no fundamental right is implicated, the Vaccine Requirement is subject to rational basis review, which it easily satisfies.

The District Court also properly dismissed Cluett's First Amendment claim. In the first place, Cluett had no constitutional right to be exempted from the University's Vaccine Requirement on religious grounds. Moreover, the Complaint does not plausibly allege that the University handled her request for an exemption in a way that violated the free exercise of her religion. The University engaged in an interactive process with Cluett that examined whether she had a sincerely held religious belief that prevented her from taking the COVID-19 Vaccine. In assessing Cluett's sincerity, the University was entitled to give some consideration to whether the religious tradition with which she associated herself (Catholicism) had an articulated tenet prohibiting administration of the COVID-19 Vaccines. In doing so, the University plainly did not express a "denominational preference" or require that she be a member of a "recognized church," as Cluett contends.

## ARGUMENT

I. **THE DISTRICT COURT PROPERLY DISMISSED STUDENTS' SUBSTANTIVE DUE PROCESS CHALLENGE TO THE UNIVERSITY'S VACCINE REQUIREMENT.**

On appeal, the Students pursue only one challenge to the overall enforceability of the Vaccine Requirement, namely, that it violates the substantive

19

component of the Fourteenth Amendment's Due Process Clause (Count I of

Complaint).  Br. 9-17.[25]  This claim fails as a matter of law, for the reasons

discussed below.

### A.	Courts Have Uniformly Affirmed the Constitutionality of Vaccine Requirements, From Smallpox to COVID-19.

While the University will address below the Students' substantive due

process claim within the conventional "tiers of scrutiny" framework, *see infra*, pp.

24-31, a broader point first bears emphasis:  In the United States, state and local

vaccine mandates have long been considered fundamentally *constitutional*.  In

---

[25]	The Students make no mention in their opening brief of their procedural due process claim (Count II of Complaint), and, thus, appellate review of the district court's dismissal of that claim has been waived.  *See Vazquez-Rivera v. Figueroa,* 759 F.3d 44, 46-47 (1st Cir. 2014) (where appellant's opening brief only challenged dismissal of his Rehabilitation Act claim and not the dismissal of various other claims, court limited its review to dismissal of that one claim); *U.S. v. Coplin*, 463 F.3d 96, 102 n. 6 (1st Cir. 2006) (arguments not raised in appellant's opening brief are waived). Even if the issue were reviewable, the District Court's dismissal of the procedural due process claim was proper.  In assessing procedural due process claims, the Supreme Court has long drawn a distinction between "proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases, on the other." *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245 (1973).  Where governmental action is legislative and not adjudicative in nature — *i.e.*, where it "has general application and look[s] to the future" — the notice and hearing requirements of the due process clause do not attach.  *Interport Pilots Agency Inc. v. Sammis*, 14 F.3d 133, 143 (2d Cir. 1994); *see also Garcia-Rubiera v. Fortuno,* 665 F.3d 261, 272 (1st Cir. 2011).  Here, "[b]ecause the Vaccine [Requirement] [was] generally applicable to all students and formulated prospectively towards the fall semester," the District Court rightly concluded that enactment and publication of the requirement (which indisputably occurred) was all the "process" that was due the Students.  App. 405-06.

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905), the Supreme Court rejected a constitutional challenge to a mandatory smallpox vaccination broadly imposed by the City of Cambridge upon its citizens (enforced by *criminal* fines), holding that such a measure represented a valid exercise of the State's police powers and did not "invade[] any right secured by the Federal Constitution." *Id*. at 38. The *Jacobson* Court made clear that "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members" and "it was the duty of the constituted authorities to keep in view the welfare, comfort and safety of the many, and not permit the interests of the many to be subordinated to the wishes or convenience of the few." *Id*. at 27, 29. Notably, the Court in *Jacobson* envisioned a very limited role for courts to play in reviewing vaccination measures: only when the measure has "no real or substantial relation" to the "public health, the public morals, or the public safety," or when the law is "beyond all question, a plain, palpable invasion of the rights secured by fundamental law" should it be disturbed. *Id*. at 31.

The *Jacobson* court upheld a "mandatory" vaccine in the truest sense — the City of Cambridge required all members of the public to be vaccinated against smallpox (except for children with documented medical exemptions). *Id*. at 12. In the years that followed, the Supreme Court has approved state policies requiring vaccination as a condition of receiving a public benefit; namely, attending school.

*See Zucht v. King*, 260 U.S. 174, 176 (1922) (rejecting due process and equal protection challenges to school vaccination requirement, stating that it is "settled that it is within the police power of a state to provide for compulsory vaccination."); *Prince v. Massachusetts*, 321 U.S. 158, 166-67 (1944) (parent and child "cannot claim freedom from compulsory vaccination . . . on religious grounds"). Applying *Jacobson*, *Zucht*, and *Prince*, federal courts in the past decade (pre-COVID-19) have rejected a series of constitutional challenges to public school vaccine mandates.[26]

And within the past year, numerous courts have upheld the constitutionality of COVID-19 vaccine requirements. Most notably, this Court, in *Does 1-6 v. Mills*, 16 F.4th 20 (2021), upheld a Maine regulation mandating that all workers in licensed healthcare facilities receive a COVID-19 vaccine. The Court determined that the regulation was constitutionally sound even though — in contrast to the Vaccine Requirement here — it did not include a religious exemption. *Id.* at 32-35. Also, in a case that bears an even closer factual resemblance to this case, the Court of Appeals for the Seventh Circuit, in *Klaassen v. Trustees of Indiana University*, 7 F.4th 592 (2021) ("*Klaassen II*"), affirmed the right of Indiana

---

[26]     *See, e.g., Phillips v. City of New York*, 775 F.3d 538, 542-45 (2d Cir. 2015); *Workman v. Mingo County Bd. of Educ*, 419 F. App'x 348, 352-56 (4th Cir. 2011); *W.B. v. Crossroads Academy-Central*, 2019 WL 6257963 at *1 (W.D. Mo. 2019); *V.D. v. State of New York*, 403 F.Supp.3d 76, 86-88 (E.D.N.Y. 2019); *Whitlow v. California,* 203 F.Supp.3d 1079, 1083-85 (S.D. Cal. 2016).

University to implement a student vaccine mandate.  Emphasizing that students "who do not want to be vaccinated may go elsewhere" to receive an education, the *Klaassen II* court found the case to be fundamentally "easier" than *Jacobson*: "Given [*Jacobson*], which holds that a state may require all members of the public to be vaccinated against smallpox, there can't be a constitutional problem with vaccination against SARS-CoV-2." *Id*. at 593.  Other federal courts of appeals have also rejected constitutional challenges to COVID-19 vaccine mandates, both in the educational context (*Doe v. San Diego Unified School District*, 19 F.4th 1173, 1177-80 (9th Cir. 2021)) and in the health care context (*We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 290 (2d Cir. 2021)).  Finally, a recent slew of federal district court cases have similarly turned away constitutional challenges to COVID-19 vaccine mandates, including specifically in the public university context.[27]

---

[27]  *See, e.g.*, *Children's Health Defense v. Rutgers,* 2021 WL 4398743, at \*5-6 (D.N.J. 2021) (denying preliminary injunction motion in constitutional challenge to COVID-19 vaccine requirement of Rutgers, the State University of New Jersey, because not likely to succeed on the merits); *America's Frontline Doctors v. Wilcox*, 2021 WL 4546923, at \*4-5 (C.D. Cal. 2021) (same as to University of California); *Gold v. Sandoval*, 2021 WL 5762190, at \*2-3 (D. Nev. 2021) (same as to University of Nevada-Reno); *Norris v. Stanley*, 2021 WL 4738827, \*1-4 (W.D. Mich. 2021) (same as to Michigan State University); *Messina v. College of New Jersey*, 2021 WL 4786114, at \*6-9 (D.N.J. 2021) (same as to College of New Jersey); *Johnson v. Brown*, 2021 WL 4846060, at \*12-16 (D. Or. 2021) (same as to Oregon state employee vaccine requirement); *Troogstad v. City of Chicago*, 2021 WL 5505542, at \*3-8 (N.D. Ill. 2021) (same as to employee vaccine requirement imposed by State of Illinois and City of Chicago).

**B.** **The Substantive Due Process Framework Compels Rejection of the Students' Challenge to the Vaccine Requirement.**

Turning to the particulars of the Students' claim, the doctrine of "substantive due process prevents governmental power from being used for purposes of oppression, or abuse of government power that shocks the conscience, or an action that is legally irrational in that it is not sufficiently keyed to any legitimate state interests." *PZF Props, Inc. v. Rodriguez*, 928 F.2d 28, 31-32 (1st Cir. 1991) (internal quotations omitted). Importantly, "[s]ubstantive due process protects only those interests that implicate one of 'those fundamental rights and liberties which are, objectively, deeply rooted in the Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 880 n.13 (1st Cir. 2010) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997)). And where state action "d[oes] not burden a fundamental right . . . [it] need only be rationally related to a legitimate purpose in order to pass Constitutional scrutiny." *LCM Enterprises, Inc. v. Dartmouth*, 14 F.3d 675, 678 (1st Cir. 1994); *see also Medeiros v. Vincent*, 431 F.3d 25, 32 (1st Cir. 2005) (where no fundamental right implicated, substantive due process is "governed by the 'rational basis' standard of review.")

### 1. The Vaccine Requirement Does Not Implicate a Fundamental Right.

Here, the University has not infringed upon the Students' fundamental rights by requiring that they be vaccinated against COVID-19 before engaging in on-campus activities. "Since *Jacobson*, courts have rejected the idea of a fundamental right to refuse vaccination," *Mass. Correction Officers Federated Union v. Baker*, 2021 WL 4822154, *6 (D. Mass. 2021), with the Seventh Circuit in *Klaassen II* offering a particularly succinct explanation:

> Plaintiffs' . . . substantive due process . . . argument depends on the existence of a fundamental right ingrained in the American legal tradition. Yet *Jacobson*, which sustained a criminal conviction for refusing to be vaccinated, shows that plaintiffs lack such a right. To the contrary, vaccination requirements, like other public-health measures, have been common in this nation.

*Klaassen II*, 7 F.4th at 593. The Second Circuit has similarly opined in the COVID-19 context that "[b]oth this Court and the Supreme Court have consistently recognized that the Constitution embodies no fundamental right that in and of itself would render vaccine requirements imposed in the public interest, in the face of a public health emergency, unconstitutional." *We the Patriots*, 17 F.4th at 293; *see also Workman*, 419 F. App'x at 355 (school vaccination requirement did not implicate a fundamental right); *Norris*, 2021 WL 4738827, at *2 ("[T]here is no fundamental right to decline a vaccination"); *Dixon v. De Blasio*, 2021 WL 4750187, at *8 (E.D.N.Y. 2021) ("[T]he right to refuse vaccination is not a

fundamental right"); *Gold*, 2021 WL 5762190, at *2 (same); *Kheriaty v. Regents of the Univ. of Cal.*, 2021 WL 4714664, at *5 (C.D. Cal. 2021) (same).

In the face of this overwhelming precedent, the Students nonetheless argue that they "did identify a fundamental right at stake" in the form of a "substantial liberty interest in refusing medical treatment." Br. 9. They cite *Cruzan v. Director of Miss. Dept. of Public Health*, 497 U.S. 261 (1990) and *Washington v. Harper*, 494 U.S. 210 (1990), cases involving the administration of unwanted lifesaving hydration and nutrition, and unwanted antipsychotic drugs, respectively. However, the Supreme Court follows a "tradition of carefully formulating the interest at stake in substantive due process cases," *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997), and here, "[t]he Vaccine Policy clearly implicates liberty interests that are distinct from *Cruzan*" and *Harper*. *Kheriaty*, 2021 WL 4714664 at *5.

In the first place, "[t]he university policy isn't forced vaccination. The students have options." *Klaassen I*, 2021 WL 3073926 at *44. Specifically, they can remain enrolled in the University and take on-line classes where available, they can "tak[e] a semester off," or they can "attend[] another university." *Id*. In other words, unlike the individuals in *Cruzan* and *Harper*, the Students can readily refuse the "unwanted medical treatment" about which they complain. *See We the Patriots,* 17 F.4th at 293-94 (distinguishing *Cruzan* because plaintiffs-employees

26

"do have a choice" as "[v]accination is a condition of employment in the healthcare field; the State is not forcibly vaccinating healthcare workers").

Second, whereas "*Cruzan* and *Harper* [involved] rights to individual bodily autonomy [that] did not impact the public health," the University's Vaccine Requirement — and vaccine requirements in general — are aimed at protecting "the health and welfare of others in the community." *Troogstad*, 2021 WL 5505542, at *5 (internal quotations omitted); *see also Mass. Corrections Officers*, 2021 WL 4822154, at *7 n.5 ("*Cruzan*'s holding . . . was limited to an individual's choice related to the refusal of lifesaving medical care and nutrition, with no impact on the health of others or the public."); *Kheriaty*, 2021 WL 4714664, at *5 (vaccine policy distinguishable from *Cruzan* because it "protect[s] the broader community at large"); *cf. We The Patriots*, 17 F.4th at 293 n.35 (Supreme Court cases involving right to personal autonomy "do not establish a broad fundamental privacy right for all medical decisions made by an individual — and particularly not for a decision with such broad community consequences as declining vaccination . . . ."). The bottom line, as this Court has recognized, is that an "interest in one's bodily integrity" is "always defined against the government's undeniable competing interests in a variety of contexts," meaning that "[t]he government [may] regulate[] in ways that affect a person's body to protect the

public interest." *Martinez v. Cui*, 608 F.3d 54, 66 & n.12 (1st Cir. 2010) (citing *Jacobson*, 197 U.S. at 26).

For these reasons, the Students' reliance on "medical treatment" cases as a means of having the Court subject the Vaccine Requirement to "strict scrutiny" is misplaced. Br. 10.

### 2. The Vaccine Requirement Easily Satisfies Rational Basis Review

Because no fundamental rights are implicated in this case, rational basis review applies. "Under the forgiving rational basis standard, the state will prevail so long as it articulates some reasonably conceivable state of facts that could provide a rational basis for the action." *A.C. Waithe v. McKee*, 23 F.4th 37, 46 (1st Cir. 2022) (internal quotations omitted). "[A]ny plausible justification [from the state] will suffice, and effectively ends the analysis." *Donahue v. City of Boston*, 371 F.3d 7, 15 (1st Cir. 2004) (internal quotations omitted). "Once a rational basis is identified, [a court] must uphold the statute or regulation even in cases when there is no empirical data in the record to support the assumptions underlying the chosen remedy." *Medeiros*, 431 F.3d at 31. Moreover, "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged [action] actually motivated the [enacting authority]." *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993). The choice of the enacting authority "is not subject

to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Id.*

Importantly, because of the nature of this analysis, this Court has regularly found that a rational basis for a particular governmental action exists *as a matter of law* and affirmed the dismissal of constitutional challenges pursuant to Fed. R. Civ. P. 12(b)(6). *See, e.g.*, *A.C. by Waithe*, 23 F.4th at 46; *Doherty v. Merck & Co., Inc.,* 892 F.3d 493, 500 (1st Cir. 2018); *Mulero-Carillo v. Roman-Hernandez*, 790 F.3d 99, 107 (1st Cir. 2015); *Toledo v. Sanchez*, 454 F.3d 24, 33-34 (1st Cir. 2006).

Here, the Vaccine Requirement is rationally related to a legitimate—indeed, compelling—government interest as a matter of law. "Stemming the spread of COVID-19 is unquestionably a compelling interest," *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020). Indeed, "[f]ew interests are more compelling than protecting public health against a deadly virus." *Does 1-6*, 16 F.4th at 32. And the threat posed by COVID-19 is especially acute in a congregate setting, such as the University, where students live, study, and eat together in close proximity. *See Klaassen II*, 7 F.4th at 593 ("[A]t a university close contact is inevitable"). In this environment, the threat of COVID-19 contagion self-evidently extends not only to the UMass student body, but also to faculty and staff at the University, and to individuals in the surrounding communities — a population that

includes thousands of older people who are at greater risk of having a severe reaction to COVID-19.

In these circumstances, the University's Vaccine Requirement represents an entirely rational way for the University to seek to limit the impact of the virus on its campuses. Both the CDC and the Massachusetts DPH have declared that the COVID Vaccines are a safe and effective way to prevent the spread of COVID-19, and the FDA has now fully approved both the Pfizer and Moderna COVID vaccines. *See* discussion, *supra*, p. 8; *Norris*, 2021 WL 4738827, at *3 ("[I]t is rational for [Michigan State University] to rely on present federal and state guidance in creating its vaccine mandate.") As this Court has aptly stated, "[t]he COVID-19 vaccines protect against infection and lower the risk of adverse health consequences, including death, should a vaccinated person become infected. Vaccination also reduces a person's risk of transmitting COVID-19 to others." *Does 1-6*, 16 F.4th at 33; *see also* note 15, *supra*. The CDC particularly encourages institutes of higher learning to offer and promote COVID-19 vaccination of students, faculty and staff. *See* note 6, *supra*. To date, over a *half-billion* doses of the COVID-19 vaccines have been administered in the United States, with the CDC reporting serious adverse reactions to the vaccines to be

"extremely unusual."[28]  In short, the Vaccine Requirement was a responsible and well-supported health measure undertaken by the University, and it "easily satisfies rational basis review," just as the Maine COVID-19 vaccine mandate for healthcare workers did in *Does 1-6*.  16 F.4th at 32; *see also Bauer v. Summey*, 2021 WL 4900922, at *11 (D.S.C. 2021) ("[N]umerous courts have recognized that preventing the spread of COVID-19 provides a rational justification for vaccine mandates.") (collecting cases).[29]

## C. The Students' Efforts to Distinguish this Case from *Jacobson* are Unavailing.

The Students argue at length why this case is distinguishable from *Jacobson*, Br. 10-17, but none of the proffered differences are material.  First, the Students assert that the holding in *Jacobson* only applies where the "legislature" directly

---

[28]   *See* CDC, "Possible Side Effects After Getting a COVID-19 Vaccine," at https://www.cdc.gov/coronavirus/2019-ncov/vaccines/expect/after.html (last visited February 25, 2022).

[29]   Students erroneously assert in the "Factual Background" section of their brief (p. 3) that the statute governing EUA's effectively prohibits vaccine mandates because it requires medical providers to inform users "of the option to accept or refuse administration of the [EUA-approved] product."  21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III).  Plaintiffs do not pursue this point in the "Argument" section of their brief, however (thus waiving it) — perhaps because it has been rendered moot by the FDA's full approval of the Pfizer and Moderna COVID-19 Vaccines.  In any event, courts have uniformly rejected this line of argument. *Klaassen I*, 2021 WL 3073926 at *25; *Norris,* 2021 WL 4738827 at *3 n.2; *Valdez*, 2021 WL 4145746, at *4-5; *Brnovich v. Biden*, 2022 WL 252396, *24 (D. Ariz. 2022); *Bridges v. Hous. Methodist Hosp.*, 543 F. Supp. 3d 525, 527 (S.D. Tex. 2021).

enacts a vaccine mandate, but not when other governmental bodies act under statutorily delegated authority. Br. 11-12. This contention is, first of all, undermined by *Jacobson* itself, which made clear that a vaccine mandate need not arise "directly by [state] legislative enactment," but rather "the state may invest local bodies called into the existence for purposes of local administration with authority in some appropriate way to safeguard the public health and public safety." *Jacobson*, 197 U.S. at 25. Consistent with this, courts have regularly applied *Jacobson* to various types of government-imposed vaccine mandates, regardless of whether the mandate was passed by the legislature, or instead instituted by a state university or by an executive branch official. *See* cases cited, *supra*, pp. 22-23 and note 27.[30] Indeed, the *Norris* court rejected an identical

---

[30] The Students erroneously contend that the University was not statutorily authorized to impose the Vaccine Requirement under Massachusetts law, Br. 11-12, 3, but this argument is unavailable to them in federal court (and it was accordingly not addressed by the District Court). Under the Eleventh Amendment, "[i]t is not the proper purview of a federal court to supervise state officials' compliance with state law." *O'Brien v. Mass. Bay Transp. Auth.*, 162 F.3d 40, 44 (1st Cir. 1998). Indeed, as the Supreme Court has stated, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials how to conform their conduct to state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). In any event, the notion that the University lacks the statutory authority to impose health-related measures on its own campuses is baseless. Under Mass. Gen. Laws ch. 75, § 1, the Board of Trustees of the University has been granted all "authority, responsibility, . . . powers and duties customarily and traditionally exercised by governing boards of institutions of higher learning" and, per Mass. Gen. Laws ch. 75, § 3A, it may delegate such powers and duties "to the president and other officers of the

(footnote continued)

argument that plaintiff's "case is different . . . because the policy in *Jacobson* was

subject to bicameralism and presentment to the Massachusetts Legislature,"

explaining:

> [T]he asserted factual differences between *Jacobson* and Plaintiff's
> case are not relevant.  Over the last year and a half, courts have looked
> to *Jacobson* to infer that a rational basis standard applies to generally
> applicable vaccine mandates; the facts of [*Jacobson*] are obviously
> not going to be identical to every COVID vaccine case that has been
> or is currently being litigated.

*Norris*, 2021 WL 4738827, at *2; *see also Professional Beauty Fed. of Cal. v.

Newsom*, 2020 WL 3056126, at *6 n.3 (C.D. Cal. 2020) ("*Jacobson* speaks of

judicial authority to review emergency health measures — its holding is not

limited to emergency health measures passed by the legislature."); *Luke's Catering

Service, LLC v. Cuomo*, 485 F. Supp. 3d 369, 380 n.4 (W.D.N.Y. 2020) (fact "that

---

university."  It has broadly exercised this delegative power through a longstanding
resolution on University governance called the "Wellman Document," which
provides, *inter alia*, that the President and Chancellors are the "executive officers"
of the University and its campuses, respectively, and are charged with
"promot[ing] the general welfare" of the University and campuses.  Addendum
("Add."), pp. 1-6.  The Chancellors have acted in accordance with these powers
here.  *See Norris*, 2021 WL 4738827 at *3 n.2 ("MSU certainly has the power to
implement its vaccine policy because the Board of Trustees has the broad power to
govern the university.")  Moreover, contrary to the Students' contention, nothing in
Mass. Gen. Laws ch. 76, §§ 15 and 15C (mandating that certain immunizations be
required as a condition of attending school across the Commonwealth) or Mass.
Gen. Laws ch. 111, § 181 (authorizing local boards of health to impose vaccination
measures) conflicts with, or even speaks to, the specific authority of UMass to take
action on its own campuses to protect the health and safety of students and staff.

*Jacobson* involved a statute passed by the state legislature, not an Executive Order" was irrelevant) (collecting cases).

Next, the Students argue that *Jacobson* is distinguishable because it related to the smallpox vaccine, which had then been in use for many years, whereas the COVID-19 Vaccines are comparatively new and allegedly have "safety and efficacy problems." Br. 12-15. They contend that the track record of the smallpox vaccine (at the time of *Jacobson*) was so well-established as to be subject to "judicial notice," but the appropriateness of a COVID-19 Vaccine requirement, by contrast, must be determined by a "trier of fact" based upon "expert evidence." *Id.* at 14. This argument is meritless. As an initial observation, the relative newness of the COVID-19 Vaccines did not prevent this Court from concluding that the Maine COVID-19 vaccine mandate in *Does 1-6* "easily satisfies rational basis review." 16 F.4th at 32. And, of course, the argument is inherently weaker now that both the Pfizer and Moderna COVID-19 Vaccines have received full FDA approval. But leaving these points aside, the argument ignores one of the fundamental teachings of *Jacobson*, while also misconstruing the nature of rational basis review. Much like in the present case, the *Jacobson* plaintiffs trumpeted the opinions "of those in the medical profession who attach little or no value to vaccination as a means of preventing the spread of smallpox, or who think that vaccination causes other diseases of the body." *Jacobson,* 197 U.S. at 30. Citing

to the fact "that an opposite theory accords with common belief and is maintained by high medical authority," the Court dismissed plaintiff's argument, explaining that "*[i]t is no part of the function of a court or a jury to determine which one of two modes was likely to be the most effective for the protection of the public against disease*." *Id*. (emphasis added); *accord, e.g.*, *Phillips*, 775 F.3d at 542 ("Plaintiffs argue that a growing body of scientific evidence demonstrates that vaccines cause more harm to society than good, but as *Jacobson* made clear, that is a determination for the [policymaker], not the individual objectors.").

This holding in *Jacobson* is consistent with rational basis review. Under such review, the University's policy choice here "is not subject to courtroom fact-finding" to determine whether it is *correct*; *i.e.*, whether the COVID-19 Vaccines, as a matter of scientific fact, are safe and effective. *Beach Communications, Inc.*, 508 U.S. at 315. Indeed, if this were the case, state and local policymakers would be mired in endless courtroom trials to establish the safety or efficacy of every new vaccine that is developed to ward off new contagious diseases. Rather, the point here is that "it is *rational* for [the University] to rely on present federal and state guidance in creating its vaccine mandate." *Norris*, 2021 WL 4738827, at *3 (emphasis added); *accord Klaassen I*, 2021 WL 3073926, at *38 (where "the students' [vaccine-related] arguments amount to disputes over the most reliable science [and] when reasonable minds can differ as to the best course of action . . .

the court doesn't intervene as long as the university's process is rational in trying to achieve public health."). Ultimately, these principles apply "regardless of whether 'science may yet show' Defendants' belief in the efficacy of the COVID vaccines 'to be wrong,' as Defendants have the right to enact orders 'adapted to prevent the spread of contagious diseases.'" *Valdez*, 2021 WL 4145746, at *8 (quoting *Jacobson* 197 U.S. at 30).

Finally, the Students cursorily argue that *Jacobson* is distinguishable because here the University "had other measures at its disposal to help fight the spread of COVID-19" such as "mask wearing, temperature checks and self-reporting." Br. 15. But, under rational basis review, the policymaker is not required "to have chosen the least restrictive means of achieving its . . . end." *Heller v. Doe*, 509 U.S. 312, 330 (1990). "As long as [the State] 'rationally advances a reasonable and identifiable governmental objective, [the court] must disregard' the existence of alternative methods of furthering the objective 'that we, as individuals, perhaps would have preferred.'" *Id*. (quoting *Schweiker v. Wilson*, 450 U.S. 221, 235 (1981)); *see also Johnson*, 2021 WL 4846060, at *15 (in COVID-19 vaccine context, "it is not the Court's role to second-guess state conduct simply because Plaintiffs present an alternative method of pursuing the state's interest.") As such, "[t]he question before the Court is not whether the [v]accine [p]olicy is the best vehicle for achieving the stated goals, but merely

36

whether the University could have had a legitimate reason for acting as it did."

*Kheriaty*, 2021 WL 6298332, at *8.

## II. THE DISTRICT COURT PROPERLY HELD THAT CLUETT FAILED TO STATE A FIRST AMENDMENT FREE EXERCISE CLAIM BASED ON THE DENIAL OF HER RELIGIOUS EXEMPTION REQUEST.

The denial of Cluett's request for a religious exemption did not violate the Free Exercise Clause of the First Amendment.[31] First, the District Court properly held that UMass is under no constitutional obligation to offer a religious exemption to its Vaccine Requirement in the first place, thus undercutting Cluett's claim that a denial of her exemption request rises to the level of a constitutional violation. App. 410. Appellants do not seem to challenge this holding in their appellate brief — nor could they, given the clear-cut case law on this point. *See Does 1-6*, 16 F.4th at 30; *Nikolao v. Lyon*, 875 F.3d 310, 316 (6th Cir. 2017) (citing *Jacobson*, 197 U.S. 11 at 38); *Phillips*, 775 F.3d at 543 (citing *Prince*, 321 U.S. at 166-67); *Workman*, 419 F. App'x at 355 (same); *Whitlow v. California*, 203 F. Supp. 3d 1079, 1086 (S.D. Cal. 2016).

---

[31] The Complaint alleges multiple state and federal constitutional and statutory claims based on the denial of Cluett's request for a religious exemption. App. 21-22. On appeal, the Students' only challenge the District Court's finding on their First Amendment Free Exercise claim. *See* Br. 17-20. Accordingly, appellate review of these other claims is waived, *Coplin*, 463 F.3d at 102 n.6, and this brief does not address the other state and federal claims related to the denial of Cluett's exemption request that the District Court properly dismissed. *See* App. 409-10.

Second, while the District Court clarified that "once the university offers religious exemptions, it must not administer them in an unconstitutional way," it properly found that the Complaint fails to plausibly allege that UMass handled Cluett's exemption request in an unconstitutional manner. App. 410. Contrary to the Students' arguments, the District Court correctly concluded that the Complaint fails to allege "anything to suggest that Defendants have administered their religious exemption policy in a way that burdens some religions but not others, or that Defendants have coerced [Cluett] in her religious practices." App. 410 (internal citations omitted). As discussed below, the District Court's rulings should be affirmed.

## A. The Complaint on its Face Fails to State a First Amendment Claim.

As a procedural matter, in reaching the decision that the Students failed to state a viable First Amendment claim, the District Court appeared to limit its discussion to the allegations contained within the "four corners" of the Complaint, and did not consider extraneous materials. App. 409 ("As to the motion to dismiss, even as alleged, Cluett's allegations regarding the denial of her religious exemption fail to state a claim."), 410 ("Here, however, Cluett has not alleged anything to suggest that Defendants have administered their religious exemption policy in [an unconstitutional] way. . . ." (internal citations omitted)). The University will do likewise and first address why the Complaint on its face does

not state a Free Exercise claim.  *See Newman v. Lehman Bros. Holdings Inc.*, 901

F.3d 19, 25 (1st Cir. 2018) ("[T]his Court generally reviews only those documents

actually considered by the district court in its 12(b)(6) analysis unless we are

persuaded that the court below erred in declining to consider proffered

documents.") (internal quotations omitted).  In section II.B., *infra,* the University

will then address why the same result applies even if this Court were to consider

certain documents referenced in the Complaint, in light of the fact that the Students

discuss these documents in their brief to this Court.[32]

The text of the Complaint only makes the conclusory allegations that

"Plaintiff Cluett has a sincerely held religious belief that precludes her from taking

the mandated vaccine" and that Vice Chancellor De Veau denied Plaintiff Cluett's

appeal on the basis that De Veau "deemed" Cluett to be Roman Catholic and that,

based on his research, the vaccine would not violate the tenets of the Catholic faith.

App. 20-21.  As noted above, because the Free Exercise Clause does not require

any religious exemption to a vaccine mandate (a principle that the Students have

---

[32]     In the argument section of their Brief, the Students freely reference declarations and exhibits that were primarily submitted for the District Court's consideration in deciding the Motion for a Preliminary Injunction.  Br. 17-19.  For the reasons explained *supra*, p. 1, the preliminary injunction decision is not the subject of this appeal.  And, on a motion to dismiss, the Students may not indiscriminately reference materials from the preliminary injunction record — especially the parties' declarations — in arguing that they have stated a claim upon which relief can be granted.  *See Rocket Learning, Inc. v. Rivera-Sanchez*, 715 F.3d 1, 9 n.5 (1st Cir. 2013).

not challenged here), *see supra* at 37, the only available Free Exercise claim is that the exemption that the University did choose to offer was administered in an unconstitutional manner.  But, as the District Court aptly observed, the Complaint's allegations are insufficient to plausibly state a Free Exercise claim that the University administered the religious exemption policy in an "unconstitutional way"; specifically, in a manner that burdened some religions but not others or "coerced" Cluett in her religious practices.  App. 410.  Particularly on the "coercion" point, there is no claim that Cluett was "coerced into . . . changing her religious beliefs or practices" or that she must "affirm a religious belief she does not share . . . ."  *Perrier-Bilbo v. U.S.*, 954 F.3d 413, 429 (1st Cir. 2020).  Nor can Cluett plausibly claim that she was "coerced by the Government[] into violating [her] religious beliefs," *Parker v. Hurley*, 514 F.3d 87, 103 (1st Cir. 2008), where she can pursue various educational options (including at the University) that do not require COVID-19 vaccination.  *See* discussion, *supra*, pp. 26-27.  Likewise, there are no allegations that Cluett's application was treated differently than any other student's application, that religious exemption requests from members of the Catholic faith went through a different process or were treated differently than any other requests, that the University "took sides" in a doctrinal debate, or that the University told Cluett that she had to be a member of an "established" religion.  *See Employment Div., Dept. of Human Resources of*

*Ore. v. Smith*, 494 U.S. 872, 877 (1990) (government may not "punish the expression of religious doctrines it believes to be false, impose special disabilities on the basis of religious views or religious status, or lend its power to one or the other side in controversies over religious authority or dogma.") (internal citations omitted); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532-33 (1993) (Free Exercise protections pertain if a law discriminates against "some or all religious beliefs" (collecting cases)); *cf. Larson v. Valente*, 456 U.S. 228, 244-46 & n.23 (1982) (law distinguishing between "well-established churches" and new churches violated the Establishment Clause because "one religious denomination cannot be officially preferred over another"). Nor, as discussed *infra*, pp. 48-49, does the allegation that De Veau considered the publicized statements of the Catholic Church in reaching his decision state a viable First Amendment claim.  Ultimately, where, as here, a state actor chooses to provide an exemption to a vaccination requirement for sincerely held religious beliefs, it does not violate an individual's Free Exercise rights for the state actor to review the facts and conclude that her objection to the vaccine is not actually based on a sincerely held religious belief, but instead is for personal or secular reasons. *Mason v. General Brown Cent. Sch. Dist.*, 851 F.2d 47, 51-52 (2d Cir. 1988) (collecting cases); *NM v. Hebrew Acad. Long Beach*, 155 F. Supp. 3d 247, 257-59 (E.D.N.Y. 2016); *Caviezel v. Great Neck Pub. Schs.*, 701 F. Supp. 2d 414, 427-30

(E.D.N.Y 2010), *aff'd* 500 F. App'x 16 (2d Cir. 2012); *Farina v. Bd. of Educ. of New York*, 116 F. Supp. 2d 503, 508 (S.D.N.Y. 2000). Accordingly, on the face of the Complaint, the Students failed to state a claim for a First Amendment Free Exercise violation.

**B.   Even Considering Certain Documents Discussed in the Complaint, the Students Fail to State a First Amendment Claim.**

While the Free Exercise claim can be decided as a matter of law based solely on the insufficiency of the allegations in the text of the Complaint, the same result would follow even if this Court were to consider documents—submitted below as part of the preliminary injunction record—that might be considered "integral to or explicitly relied upon in the complaint" and, thus, fairly considered on a motion to dismiss. *Shaw,* 82 F.3d at 1220. Since the Students rely heavily on extraneous materials in the First Amendment section of their legal argument, *see* Br. 17-18, the University will also address this broader universe of documents, mindful of the limits of what materials can be considered on a Rule 12(b)(6) motion.

**1.   The University Engaged in a Standard Interactive Process, Focused on Whether Cluett Had a Sincerely Held Religious Belief That Prevented Her From Receiving the COVID-19 Vaccine.**

As an initial matter, the allegations in the Complaint and the chain of communications referenced therein (App. 20-21) establish that the University engaged in a standard interactive process in reviewing Cluett's request for a religious exemption: Cluett's request first went to a review committee which

42

denied the request; Cluett was informed of her right to appeal the committee's decision to De Veau; De Veau explained the appeals process to Cluett; Cluett submitted further information; and De Veau denied the exemption request, but expressly offered Cluett the opportunity to submit further clarification and information. App. 20-21, 99, 103, 105-06, 108-09, 111, 338, 345, 348-52. When administering a religious exemption program, it is commonplace — and certainly not unlawful — to engage in such an interactive process through which the applicant is asked to provide explanation and documentation of her religious belief. *See*, *e.g.*, *Together Employees v. Mass. Gen. Brigham Inc.*, 2021 WL 5234394, *17-18 (D. Mass. 2021) (in Title VII context, employer engaged in an interactive process in considering religious exemption requests to vaccine policy by establishing review committee, sending follow-up questions "tailored to the particular religious objection of each employee," directing employees to send responses and supporting documentation, and in some cases sending additional follow-up questions if more information was needed); *Friedman v. Clarkstown Cent. Sch. Dist.*, 75 F. App'x 815, 820 (2d Cir. 2003) ("the superintendent did not violate the constitution by asking plaintiff to submit documentation describing the basis for her objections to immunizations").

Moreover, the Complaint and the parties' communications make clear that the focus of the University's inquiry was whether Cluett, in fact, had a "sincerely

held religious belief" that prevented her from taking the COVID-19 Vaccine. App.

20-21, 105-06, 349-51. It is well-established that state actors do not run afoul of

the Free Exercise Clause by examining the sincerity of a stated religious objection.

*See*, *e.g.*, *United States v. Seeger*, 380 U.S. 163, 185 (1965) (appropriate to

examine the "threshold question of sincerity"). Indeed, even when the facts may

show that a plaintiff is devoutly religious, denial of an exemption is appropriate

where the plaintiff's opposition to vaccination is a selective personal belief, as

opposed to a religious one. *See NM*, 155 F. Supp. 3d at 258; *Caviezel*, 701 F.

Supp.2d at 429-30. Importantly, an individual's assertion that his or her belief is

religious does not automatically make it so. *Mason*, 851 F.2d at 51.

Ultimately, based on the materials that may be considered on a motion to

dismiss, there were several legitimate factors underlying the University's

conclusion that Cluett's opposition to vaccination was a personal, secular opinion

not based in religious beliefs, including (1) Cluett's letter to the University that

detailed her upbringing in the Roman Catholic religion, when the leaders of the

Roman Catholic faith had issued public statements supporting the use of the

COVID-19 Vaccine (App. 108-11, 348); (2) Cluett's prior practice of receiving

vaccines without seeking a religious exemption (App. 105-06, 350-51);[33] and (3)

---

[33] "Evidence that an [individual] acted inconsistently with his or her professed belief is relevant in assessing whether a belief is sincerely held." *Together*

(footnote continued)

Cluett's stated objection to the vaccine referring to medical, health, and lifestyle reasons, including relying on "naturopathic medicine" (App. 108-09).[34]  As a matter of law, each of these factors was appropriate to consider in assessing the sincerity of Cluett's asserted religious belief as a basis for exemption from the Vaccine Requirement.

### 2. Vice Chancellor De Veau's Questions and Observations Regarding the Catholic Church Do Not Give Rise to a First Amendment Claim.

The thrust of Cluett's Free Exercise claim relates to De Veau's email dated July 26, 2021, in which he states that "I have read your faith to be Roman Catholic," based upon Cluett's prior description of her Catholic upbringing, and then says "If this is incorrect, please let me know."  App. 111.  Pointing to public

---

*Employees,* 2021 WL 5234394, at \*16 (citing *EEOC v. Union Independiente de la Autoridad de Aceuductos y Alcantarillados de P.R.*, 279 F.3d 49, 56 (1st Cir. 2002)).  On this topic of prior vaccinations, Cluett's statement in her brief that "she hasn't received a single vaccine since becoming an adult," Br. 18, is addressed, *infra*, pp 52-53.

[34]  Where a plaintiff cites no controlling religious tenet, and opposition to a vaccine is based on concern over one's health, courts have found that such beliefs are personal and secular rather than sincerely religious, such that states may constitutionally deny requests for religious exemptions to vaccinations.  *See NM*, 155 F. Supp. 3d at 258-59; *Check v. New York City Dep't of Educ.*, 2013 WL 2181045, \*9-11 (E.D.N.Y. May 20, 2013); *Caviezel*, 701 F. Supp. 2d at 429-30; *Farina*, 116 F. Supp. 2d at 508, 513; *Sherr v. Northport-East Northport Union Free Sch. Dist.*, 672 F. Supp. 81, 95-96 (E.D.N.Y. 1987); *Morin v. MGH Inst. of Health Professions*, 2002 WL 31441509, \*4, 15 Mass.L.Rptr. 417 (Mass. Super. Ct. 2002) (unreported).

statements from leaders of the Catholic Church supporting use of the COVID-19 Vaccines, De Veau then tells Cluett that he cannot grant her exemption request without further information from her. *Id.* Appellants argue that De Veau here "placed himself in a position to determine the validity of Cluett's belief based upon what 'leaders of the Roman Catholic Church' stated publicly." Br. 18. They contend further that this "demonstrates a denominational preference," and that by "choosing to accept only certain religious tenets and practices, the defendants established a set of favored religious tenets." *Id.* at 19-20. Appellants misconstrue the interactive process through which De Veau reviewed appeals of denied applications for religious exemptions, which did not involve any determination of the "validity" of Cluett's beliefs or the establishment of any denominational preference.

As an initial point of clarification, De Veau assuredly did not require Cluett to provide "a signed statement from a religious official" describing a religious tenet, as stated in Appellants' brief. *Id.* at 18-19. As the emails between De Veau and Cluett show, De Veau required Cluett to show a sincerely held religious belief, and explained that proof of a sincerely held religious belief could include *either* a "signed statement from a religious official describing the religious tenet that precludes the taking of a vaccine *and/or [a] personally written statement describing the religious basis for[the] objection to taking this vaccine versus the*

*other vaccines which [she had] previously submitted evidence of having received*." App. 105-06, 349-51 (emphasis added). As such, there was no requirement that a sincerely held religious belief had to fall within recognized religious tenets and practices because an individual could meet the requirement of proof of a sincerely held religious belief by "describing the religious basis for [the] objection to taking this vaccine, versus the other vaccines" received in the past. App. 105-06, 350-351.

By permitting Cluett to provide a personal statement about the sincerity of her religious beliefs, the University did not restrict the availability of a religious exemption to any particular religion, or only to beliefs shared by all of the members of a religious sect. Contrary to Appellants' contentions, the University did not demonstrate a "denominational preference" in denying Cluett's exemption request. Br. 19. The Students' Complaint thus does not allege a situation similar to that found in *Dalli v. Board of Education*, 358 Mass. 753, 267 N.E.2d 269 (1971), where religious exemptions were expressly limited to those who subscribed to the "tenets and practice of a *recognized* church or religious denomination." 358 Mass. at 758-59 (emphasis added). Unlike *Dalli*, the denial of Cluett's religious exemption request was not based on whether she was a member of a recognized religion; rather, it was based on the sincerity of her beliefs as religious based on the information she provided. *See* App. 105-06, 350-51. Throughout the process, the

University maintained that she could provide a statement from a religious official *or* a personal statement explaining the nature of her religious belief. *See id.* It is well-established that such a practice of seeking additional information and requesting documentation describing the basis for the religious exemption is constitutional. *See Friedman,* 75 F. App'x at 820.

Moreover, in referencing the public statements of Catholic Church leaders, De Veau nowhere states that Cluett's religious beliefs were somehow "invalid" because they were not consistent with the views of others in the Catholic Church. De Veau does not make a categorical determination that a member of the Catholic Church could not hold a sincerely religious belief opposing COVID-19 vaccination. Rather, the comparison of Cluett's religious exemption request with the public statements of the leaders of the religion she associated herself with was a permissible aspect of considering the *sincerity* of her stated religious belief. Courts have held that, in administering a religious exemption policy, a state actor "is entitled to give *some* consideration to an organization's tenets" to ensure that a given request reflects a sincere religious belief rather than a secular preference:

> For the more a given person's professed beliefs differ from the orthodox beliefs of his faith, the less likely they are to be sincerely held. Very few people who identify themselves as Baptists sincerely believe that a halal or vegan diet is obligatory on religious grounds. Such a belief isn't impossible, but it is sufficiently rare that a [state official administering program] could be skeptical and conduct an inquiry to determine whether the claim was nonetheless sincere."

*Vinning-El v. Evans*, 657 F.3d 591, 594 (7th Cir. 2011) (emphasis in original). *See also Ackerman v. Washington,* 16 F.4th 170, 181 (6th Cir. 2021) (favorably quoting above language from *Vinning-El*). Where an individual's asserted religious belief is at odds with the stated tenets of the religion the individual describes belonging to, this calls into question the sincerity of the individual's religious beliefs, warranting further inquiry and additional information from the individual to explain how their belief is religious in nature. *See Caviezel*, 70 F. Supp. 2d at 429, *aff'd*, 500 F. App'x 16 (2d Cir. 2012) (plaintiff's objection to vaccine was not sincerely held religious belief where church to which plaintiff belonged did not oppose vaccination); *N.M.,* 155 F. Supp. 3d at 258 ("[T]he record clearly does not support a finding that Orthodox Judaism, even as interpreted by these particular plaintiffs, forbids the practice [of vaccination]."); *Together Employees*, 2021 WL 5234394, at *16 (in Title VII context, "the fact that the professed religious beliefs [did] not appear to comport entirely with the doctrine of any organized religion [….] does not end the inquiry, but surely bears on it to some degree."), *injunction pending appeal denied*, 19 F.4th 1 (1st Cir. 2021) (characterizing district court's opinion as "well-reasoned").

To the extent Cluett now takes issue with De Veau's understanding that she was, in fact, Roman Catholic, De Veau based his analysis on Cluett's own description of her religious background in her submissions, and asked her to

correct him if he had misunderstood.  App. 111, 348.  Specifically, De Veau told

Cluett via email that based on her submissions to the University — which included

descriptions of attending religious education, baptism, confession, Holy

Communion, and confirmation as well as that her parents "are of Christian faith,"

App. 108 — he understood her religion to be Roman Catholic.  App. 108-11, 348.

In the same email, he also told her that if his understanding was incorrect to please

let him know and that she could provide additional information to establish the

sincerity of her religious objection to vaccination.  App. 111, 348.  Cluett does not

— and could not — allege that she ever responded to De Veau's requests for more

information.  *See* App. 21-22.  None of this amounts to University officials

challenging the validity or orthodoxy of Cluett's religious views, requiring her to

be a member of an established religion, or requiring her to ascribe to a particular

set of religious tenets to qualify for an exemption.

C.    **This Court Should Not Consider the Students' First Amendment Arguments Raised for the First Time on Appeal.**

Finally, for the first time on appeal, the Students appear to argue that the

University's Vaccine Requirement is not a "generally applicable" rule for First

Amendment purposes, citing *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1871

(2021).  Br. 19.  Because this argument was not raised below, however, *see*

Plaintiffs' Memorandum of Law in Support of Preliminary Injunction and

Plaintiff's Opposition to Motion to Dismiss (Add. 7-12), it cannot be pursued now on appeal. *See Rockwood v. SKF USA Inc.*, 687 F.3d 1, 9 (1st Cir. 2012).

In any event, the Students' citation to *Fulton* is misplaced. In that case, the Supreme Court found that the rule at issue – which contained *no religious exemption* – was not generally applicable because it allowed a city commissioner "in his/her sole discretion" to evaluate and approve individual requests for exemptions, thereby "'invit[ing]' the government to decide which reasons for not complying with the policy are worthy of solicitude." *Fulton*, 141 S. Ct. at 1878-79. Here, there is no such rule granting University officials free rein to decide whether particular categories of reasons for exemption to the Vaccine Requirement should be recognized. Rather, there are established categories of exemptions, *i.e.*, medical and religious, both of which must be supported by appropriate information to substantiate the basis for the claimed exemption. "'[A]n exemption is not individualized simply because it contains express exceptions for objectively defined categories of persons.'" *We the Patriots*, 17 F.4th at 288 (quoting *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1187 (10th Cir. 2021)). Rather, there must be some showing that the exemption procedures allow "secularly motivated conduct [to] be impermissibly favored over religiously motivated conduct." *Id*. at 289; *see also Does 1-6*, 16 F. 4th at 30 ("[I]f a state reserves the authority to 'grant exemptions based on the circumstances underlying each application,' it must

provide a compelling reason to exclude 'religious hardship' from its scheme")
(quoting *Fulton*, 141 S. Ct. at 1877)  Where, as here, the Vaccine Requirement
provides for "objectively defined category[ies] of people to whom the vaccine
requirement does not apply," it does not contain the "mechanism for individualized
exemptions" that rendered the law not generally applicable in *Fulton*.  *We the
Patriots,* 17 F.4th at 288-89; *Does 1-6,* 16 F.4th at 30.

## III. THE DISTRICT COURT'S DENIAL OF THE STUDENTS' PRELIMINARY INJUNCTION MOTION SHOULD NOT BE REVIEWED OR REVERSED.

Finally, as discussed, *supra*, p. 1, the district court's denial of the Students'
preliminary injunction motion is now plainly moot and not subject to appellate
review because the district court has entered a final judgment of dismissal as to all
of the Students' claims.  *Capriole*, 991 F.3d at 343.  But even if this Court were to
review the district court's denial of preliminary relief, there was plainly no abuse
of discretion.  *See Does 1-6*, 16 F.4th at 29 (denial of preliminary injunction
reviewed for abuse of discretion).  For all the reasons stated in Sections I and II,
*supra*, the Students have no likelihood of succeeding on the merits of their
substantive due process or First Amendment claims.  Indeed, Cluett's Free
Exercise claim, in particular, grows even weaker when one considers certain
evidence in the preliminary injunction record that was not referenced in the
Students' Complaint.  For example, Cluett has previously been administered

numerous vaccines throughout her life, including when she was in her late teenage years. App. 101. In fact, on 15 occasions, she received a voluntary vaccine (*i.e.*, the influenza vaccine) that is not required as a condition of attending school in Massachusetts. *Id.* Additionally, Cluett made comments in an April 27, 2021, social media post (which was brought to the attention of De Veau prior to his decision) that raised objections to the COVID-19 Vaccines on personal and political grounds. App. 92, 113. In that post, she wrote:

> Opinions on vaccine safety aside medical tyranny is alive and well, this is fascist insanity from the most far leftist leaning university system in the state. My family's hard earned taxpayer dollars have funded this institution my entire life. I will be showing up to campus unvaccinated [emoji smiley face].

*Id.*

Although the other preliminary injunction factors become "matters of idle curiosity" in the absence of a likelihood of success on the merits, *Shurtleff v. City of Boston*, 986 F.3d 78, 86 (1st Cir. 2021) (citations omitted), the Students' showing of irreparable harm at the preliminary injunction stage was also non-existent. Contrary to the sworn statements attached to their verified complaint, the Students did not face "expulsion" for failing to receive the COVID-19 Vaccination. App. 24-25. In fact, it is now admitted that "Cluett is still attending the University of Massachusetts Boston, conducting remote learning." Br. 7. Harris is likewise continuing his education at the University of South Carolina. *Id.*

Cluett also informed the District Court that she was the recipient of the Chancellor's Merit Scholarship at UMass Boston, App. 352, but she has never claimed – and could not claim – that these scholarship monies would be forfeited if she continued her studies remotely at UMass Boston, as she is doing.[35]  She now states in her brief that she "has lost at least one scholarship" as a result of the Vaccine Requirement, Br. 7, but she provides no support for this assertion, which she raises for the first time on appeal.

## CONCLUSION

For the foregoing reasons, this Court should affirm the District Court's dismissal of the Students' Complaint, and it should dismiss the Students' appeal of the District Court's preliminary injunction ruling as moot.

Respectfully submitted,

MAURA HEALEY
   *Attorney General of Massachusetts*

*/s/ Richard S. Weitzel*
Richard S. Weitzel, 1st Cir. No. 54006
Christine Fimognari, 1st Cir. No. 1198115
   *Assistant Attorneys General*
Government Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2022
Richard.Weitzel@mass.gov
Christine.Fimognari@mass.gov

---

[35]    In fact, the University can represent to the Court that Cluett received the Chancellor's Merit Scholarship for this academic year.

## CERTIFICATE OF COMPLIANCE WITH RULE 32

1.      This Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,951 words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f).

2.      This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman style, 14-point font.

*/s/ Richard S. Weitzel*  
Richard S. Weitzel (1st Cir. No. 54006)  
Assistant Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2022, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that the following counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system:

Ryan McLane, Esq.  
MCLANE & MCLANE, LLC  
269 South Westfield Street  
Feeding Hills, MA 01030  
ryan@mclanelaw.com  
*Attorneys for Plaintiffs-Appellants*

*/s/ Richard S. Weitzel*  
Richard S. Weitzel (1st Cir. No. 54006)  
Assistant Attorney General

# ADDENDUM

# TABLE OF CONTENTS

University of Massachusetts, Board of Trustees Statement of University Governance,
Document T73-098, as amended February 3, 1993 ............................................................A1

Plaintiffs' Memorandum of Law in Support of Preliminary Injunction (excerpts),
dated July 30, 2021 ............................................................................................................A7

Plaintiffs' Partial Assent and Opposition to Defendants' Motion to Dismiss,
dated August 24, 2021 .....................................................................................................A11

Mass. Gen. Laws c. 75, § 1 ...................................................................................................A13

Mass. Gen. Laws c. 75, § 3A ................................................................................................A15

Mass. Gen. Laws c. 76, § 15 .................................................................................................A16

Mass. Gen. Laws c. 76, § 15C ..............................................................................................A18

Mass. Gen. Laws c. 111, § 181 .............................................................................................A20

21 U.S.C. § 360bbb-3 ...........................................................................................................A21

**Doc. T73-098, as amended**
*Passed by the BoT*
*4/4/73*
*Revised 4/2/75*
*Revised 6/1/88*
*Revised 2/3/93*

## UNIVERSITY OF MASSACHUSETTS
## BOARD OF TRUSTEES STATEMENT OF UNIVERSITY GOVERNANCE

### I. <u>TRUSTEE POLICY ON UNIVERSITY GOVERNANCE</u>

### A. ENDORSEMENT OF AAUP STATEMENTS ON GOVERNANCE

1. The Board of Trustees has all authority, responsibility, rights, privileges, powers and duties of organization and government of the University of Massachusetts as provided in Chapter 75 of the General Laws of the Commonwealth. Nothing in the following statement shall be taken as contravening that authority or any applicable federal or state law or regulation; anything contravening such authority, law or regulation is void.

2. Nevertheless, as an established university discharges its obligations and responsibilities to society by the advancement and dissemination of knowledge, the variety and complexity of its tasks require and ensure the interdependence of the governing board, the administration, the faculty, and the students, as well as other groups. The Board of Trustees has long recognized this interdependence, both among campuses within the system and among the various components within a campus, and now formally adopts the principle of joint effort in governing the University.

3. Joint effort in University governance will take a variety of forms depending on the issue and the situation. The administrative officers or the Board may in some instances propose recommendations for the consideration of the faculty and/or students before taking final action. The faculty and/or students may in other instances propose recommendations subject only to the endorsement of the administration and the Board. In all instances, however, the principle of joint effort requires that components within the University remain sensitive to the interests of other components.

4. The Board of Trustees therefore endorses in principle the 1966 <u>Statement on Government of Colleges and Universities</u> adopted by the American Association of University Professors, the American Council of Education, and the Association of Governing Boards of Universities and Colleges and the 1970 statement on <u>Student Participation in College and University Government</u> formulated by the three aforementioned organizations, insofar as both are consistent with this Trustees' Statement on University Governance. In endorsing these two statements, the Board, while retaining its ultimate legal authority in governing the University, recognizes that the faculty, the students, and other groups within the University have the right, the responsibility, and the privilege of advising on policies affecting the University. The Board will ensure these rights, responsibilities, and privileges through the various governing bodies--both representative bodies such as senates and assemblies, and administrative bodies such as departments, school, and colleges--established by its bylaws and other actions.

**-306.1-**

**B. PRIMARY RESPONSIBILITIES IN GOVERNANCE**

1.  The Board of Trustees recognizes that while it must exercise general authority over the University, certain components of the University, such as the President's Office, the campus administrations, and the representative and administrative governing bodies of the faculty and the students have, by virtue of interest, training, and experience, a special concern and competence in certain areas. Subject to precedents established by components on each campus and/or the restraints and procedures specified in their constitutions, these components shall have primary responsibility in their areas of special competence and concern. Whenever the phrase "primary responsibility" appears in this statement, it shall mean the capacity to initiate recommendations, after appropriate consultation, in accordance with the procedures specified in section II. D below. Such recommendations will be overruled only by written reasons stated in detail. While it in no way is intended to contravene the authority and participation of the Board of Trustees in governance, the following is a general statement of primary responsibility in the major areas of University life.

2.  ACADEMIC MATTERS: By virtue of its professional preparation and its central concern with learning and teaching the faculty will exercise primary responsibility in such academic matters as curriculum, subject matter and methods of instruction, research, admissions, libraries, and other aspects of University life which directly relate to the educational process. Students share this concern and they will be assured the opportunity of participating in developing academic policies and in evaluating degrees, programs, and courses.

3.  FACULTY STATUS: The faculty will have primary responsibility for matters of faculty status, such as appointments, reappointments, promotions, tenure, and salary adjustments. Students will also be assured the opportunity of participating in the evaluation of a faculty member's effectiveness.

4.  STUDENT AFFAIRS: Students will have primary responsibility for services and activities which are designed primarily to serve students or those which are financed primarily by students, managing student political affairs and organizational matters, and setting standards for student behavior, conduct, and discipline.

5.  PLANNING, DEVELOPMENT AND BUDGET: The President is responsible for exerting educational leadership in the planning and development of the University, both before the Board of Trustees and on the various campuses. He/she shall coordinate the planning and development on the separate campuses, keep current a University master plan, and ensure that all appropriate components of the University have the opportunity to make recommendations before planning and development decisions are rendered. The President is also responsible for coordinating, preparing, and presenting to the Board of Trustees the University's annual budget request. He/she shall represent the budget request approved by the Board to the Governor and the General Court. The Chancellors are responsible for coordinating, preparing, and presenting to the President budget requests from the campuses. The President is responsible for continually improving the budget process and developing a calendar which allows adequate time for consultation and study by all interested components of the University.

**II.** **RESPONSIBIITIES, DUTIES, FUNCTIONS, AND PROCEDURES OF THE BOARD OF TRUSTEES, THE PRESIDENT, THE CAMPUS ADMINISTRATORS, AND THE CAMPUS GOVERNING BODIES IN UNIVERSITY GOVERNANCE**

Consistent with Chapter 15A and pursuant to Chapter 75 of the General Laws of the Commonwealth, the Board of Trustees may establish general policies governing the University. The authority of the Board shall include, but is not limited to, the following specific powers:

**A.** **BOARD OF TRUSTEES**

1. The Trustees will consider, upon the recommendation of the appropriate faculty and student governing bodies and/or other appropriate groups, the academic plans, personnel policies, and admissions policies of each campus and of the University as a whole; plans for the establishment of new campuses, schools, institutes, and colleges, and plans for the closing of already established units and programs.

2. The Trustees will consider, upon the recommendation of the appropriate governing body(s), the establishment of degrees.

3. The Trustees will consider the budget requests of the University and the capital outlay budget requests and major amendments thereto. In addition, they will consider new student housing and other loan construction programs, accept gifts, and approve service agreements, rental agreements, and leases. Further, they will consider policies governing the solicitation of grants and research contracts.

4. The Trustees will appoint the President, the Chancellors, the Treasurer, and the Secretary of the University, set their salaries, and periodically evaluate their performance. When appointing the President, the Board will seek nominations from a broadly representative search committee appointed by the Board. The Board will determine the charge to and composition of the search committee after seeking the recommendations of the appropriate campus governing body(s) and, when appropriate, other components of the University. The Board will appoint faculty and student representatives to the search committee upon nomination by the appropriate governing body(s). When appointing a Chancellor, the Board will seek nominations from a broadly representative search committee appointed by the Chair of the Trustees in consultation with the President. The Chair will determine the charge to and composition of the search committee after seeking the recommendations of the appropriate campus governing body(s) and, when appropriate, other components of the University. The Board will appoint faculty and student representatives to the search committee upon nomination by the appropriate governing body(s). The President will recommend two or more candidates to the Board.

5. The Trustees will consider long-range development and design plans for each campus in relation to long-range academic plans and any major amendments to these plans. They will approve consulting architects, landscape architects, executive architects, and the designs for major campuses, consistent with the authority vested in the Department of Capital Planning and Operations.

6. The Trustees will consider all policies concerning the University's relationship with local, state, and federal governments and all policies concerning public information.  In this regard the Board will consider policies concerning the University relationship with other segments of higher education.

7. The Trustees will make the final selection of all honorary degree recipients and will name all buildings and facilities.

**B.    PRESIDENT OF THE UNIVERISTY**

1  The President is the principal academic and executive officer of the University.  He/she will exercise executive authority over the campuses comprising the University subject to the direction of the Board of Trustees.  He/she will serve as chief spokesman and interpreter of the University and represent it to the general public and its representatives.

2. The President will be responsible for presenting policy recommendations to the Board of Trustees and ensuring that the campuses develop ways of implementing Trustees' policy.  He/She will develop, coordinate, and keep current a master plan of the University.  He/She will be responsible for the coordination and preparation of the annual budget request and its presentation to the Board of Trustees and to the Governor and the General Court.  He/she will also be responsible for the allocation of the appropriated budget and all other funds.

3. The President will appoint, promote and grant salary adjustments to personnel in the President's Office.  He/She will supervise the operations of the officers and staff in the President's Office.

4. The President will appoint the Vice Presidents with the concurrence of the Board of Trustees.

5. The President will appoint members of the faculty to tenure with the concurrence of the Board of Trustees.

6. The President will coordinate the work of all campuses of the University and promote the general welfare of the university as a whole in its several parts.  He/she will ensure as much campus autonomy as possible commensurate with achieving the central purposes of the University or fulfilling his/her duties as specified herein.  The President will establish and maintain an effective communications system with the University that allows for the prompt identification of needs and problems and their analysis.  In particular, the President, in concert with the Chancellors, will ensure that all appropriate components of the University have the opportunity to make recommendations prior to the establishment of policy.

7. The President may refer for investigation and report any matter of institutional concern to administrative staff, governing bodies, faculty, or students.  The channel for official communications between the President and the various campus groups in such matter will be through the Chancellor.

**C. CAMPUS CHANCELLOR**

1. The Chancellor is the chief academic and executive officer of the campus. He/she will exercise executive authority over the campus subject to the direction of the President. He/she will be responsible to the President for administering the various schools, colleges, divisions, departments, and other units on the campus.

2. In the formulation of policy the Chancellor will represent his/her campus to the President and the Board of Trustees, and upon the adoption of policy he/she will ensure its implementation on campus. He/she will develop, coordinate, and present to the President immediate and long-range plans for the campus. The Chancellor will also coordinate, prepare, and present to the President the annual budget request of the campus and oversee campus expenditures.

3. The Chancellor will appoint the Vice Chancellors, the Provosts, and the Deans of the campus upon delegation by the President, set their salaries, and periodically evaluate their performance. When appointing a Vice Chancellor with line responsibilities, a Provost, or a Dean, the Chancellor will seek nominations from a broadly representative search committee. The Chancellor and the appropriate governing body(s), representative and/or administrative, will mutually agree upon the composition and the charge of the search committee. The Chancellor will appoint faculty and student representatives to the search committee upon nomination by the appropriate governing body(s).

4. The Chancellor will appoint, promote, and grant salary adjustments to professional and nonprofessional personnel on campus.

5. The Chancellor will coordinate the work of the various units of the campus and promote the general welfare of the campus as a whole and in its several parts. He/she will ensure as much autonomy as possible to the various units of the campus commensurate with achieving the central purposes of the campus and the University as a whole or fulfilling his/her duties as specified herein. He/she will assist the President in maintaining an effective communications system within the campus that allows for the prompt identification of needs and problems and their analysis. In particular, the Chancellor will assist the President in ensuring that all appropriate components of the campus have the opportunity to make recommendations prior to the establishment of policy.

6. The Chancellor may refer for investigation and report any matter of institutional concern to administrative staff, governing bodies, faculty and students.

**D. CAMPUS GOVERNING BODIES**

1. Faculty and students may be organized into governing bodies, such as senates and assemblies, departments, schools, and colleges. The constitutions of the major governing bodies must be approved by the Board of Trustees.

2. When appropriate, governing bodies shall have the privilege of recommending policies and procedures affecting the campus and the University as a whole, including, among others matters, academic matters, matters of faculty status, and student affairs. Also when appropriate, governing bodies will have the privilege of contributing to long-range planning, the preparation of the annual budget request, and the allocation of available resources.

**-306.5-**

3. The Chancellor, the President, and the Board of Trustees may approve recommendations from the campus representative governing bodies at any time. Subject to precedents established by components of each campus and/or the restraints and procedures specified in their constitutions, and in accordance with the preceding statements of primary responsibility (Section I. B of this statement), recommendations adopted by the campus representative governing bodies will become policy unless (1) disapproved or sent back for reconsideration by the Chancellor within twenty working days of receipt of notification from the governing body; (2) disapproved, sent back for reconsideration, or deferred by the President within twenty working days of receipt of notification of the Chancellor's approval or within twenty working days following the expiration of the twenty working-day period for the Chancellor's consideration; (3) disapproved by the President during a special thirty-working-deferral period (if the President chooses to defer his/her decision he/she will notify the governing body; the deferral period will begin at the end of the President's initial twenty-working-day period of consideration); (4) disapproved by the Board of Trustees within these specified time limitations. The governing bodies will notify the Chancellor, the President, and the Board of Trustees of their actions as soon as possible after their adoption. Any matter not acted upon within seventy-working-days of receipt of notification by the Chancellor of an action by a governing body will be taken as approved by the Board of Trustees. When a recommendation is disapproved, the governing body will receive written reasons in detail for the adverse decision.

## III. __IMPLEMENTATION__

Provision for implementing the foregoing policies and procedures of University governance shall be subject to the approval of the Board of Trustees

## IV. __APPROVAL AND EVALUATION__

The Board of Trustees reserves the right to alter, amend or revoke the foregoing Statement on University Governance, in part or whole, at any time. The Board of Trustees will review the foregoing policies and procedures every five years.

**-306.6-**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **HUNTER HARRIS and** ) | |
| **CORA CLUETT,** ) | |
| **Plaintiffs** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO.** |
| ) | |
| **UNIVERSITY OF MASSACHUSETTS** ) | |
| **LOWELL, JACQUELINE MOLONEY,** ) | |
| **UNIVERSITY OF MASSACHUSETTS** ) | |
| **BOSTON, MARCELO SUÁREZ-** ) | |
| **OROZCO and SHAWN DE VEAU** ) | |
| **Defendants** ) | |

**MEMORANDUM OF LAW**
**IN SUPPORT OF PRELIMINARY INJUNCTION**

ATTORNEY FOR PLAINTIFFS:

_____/s/ Ryan P. McLane_____
Ryan P. McLane, Esq. (Juris: 438176)
McLane & McLane, LLC
269 South Westfield Street
Feeding Hills, MA 01030
Ph. (413) 789-7771
Fax (413) 789-7731
E-mail: ryan@mclanelaw.com

**ORAL ARGUMENT REQUESTED**

1

A07

Plaintiffs, Hunter Harris and Cora Cluett, in accordance with Fed. R. Civ. P. 65, file this memorandum of law in support of their Motion for Preliminary Injunction.

**INTRODUCTION**

Defendants have violated plaintiffs' procedural and substantive due process rights and other individual rights under the United States Constitution, along with violations of law regarding informed consent and civil rights violations under 42 U.S.C. § 1983, by implementing and enforcing almost identical mandates ("mandate") which require that their students be vaccinated against COVID-19 as a condition of their enrollment and/or attendance at both the University of Massachusetts Lowell and the University of Massachusetts Boston. These mandates are subject to medical and religious exemptions. Defendants Boston De Veau and Suarez- Orozco additionally denied plaintiff Cluett's valid and properly asserted religious exemption.

None of the available COVID-19 vaccines have been approved by the Food and Drug Administration, but rather authorized for emergency use under the Emergency Use Authorization statute, 21 U.S.C. § 360bbb-3. Defendants' policies will cause irreparable harm to the plaintiffs by any of the following:

1. through forcing them to take an unapproved drug that they do not wish to take; or

2. by subjecting them to expulsion; and

2

3. with respect to plaintiff Cluett, either of the above and potentially a violation of her sincerely held religious beliefs and convictions if she were to take the vaccine.

**Plaintiffs are therefore seeking preliminary injunctive relief against the defendants' mandates, further asking the Court to ORDER that they withdraw the policies mandating vaccination of students with a drug that has not been approved by the FDA unless the student chooses to take the drug of their own choosing. Time is of the essence with this request, as the Fall semesters are scheduled to begin September 1, 2021 and September 8, 2021.**

## FACTS

Plaintiff Hunter Harris is enrolled as an undergraduate at the University of Massachusetts Lowell. Plaintiff Cora Cluett is an undergraduate, enrolled at the University of Massachusetts Boston, having obtained the Chancellor's Merit Scholarship of $10,000 where she also runs for their NCAA track team. The UMass Boston policy was announced on April 26, 2021, requiring all UMass Boston students to be vaccinated against COVID-19 in order to attend in-person class or be on campus[1]. (V. Compl., ECF 1, ¶14, p.3). The UMass Lowell policy was announced on April 28, 2021 with virtually identical language. (V. Compl., ECF 1, ¶10, p.2).

---

[1] https://www.umb.edu/news/detail/an_update_on_vaccinations_for_the_umass_boston_community

3

**AS TO CLUETT'S RELIGIOUS EXEMPTION**

Cluett's claims over the denial of her religious exemption have an incredibly strong likelihood of success on the merits, as G.L. c. 76 § 15, the defendants' policy, 105 C.M.R 220.500 and *Dalli v. Board of Education¸* 358 Mass. 753 (1971) all make clear that Cluett 1) has a right to assert a religious exemption to defendants Boston, Suárez-Orozco and De Veau's Mandate and 2) that defendant De Veau, with defendant Suárez-Orozco's knowledge, was clearly in error when he denied her exemption based on criteria that violates state and constitutional law.

The harm that Cluett would suffer is the same as listed above, but also includes either being forced to take a vaccine that would violate her religious beliefs and that she could lose out on her education, liberty and bodily autonomy over being denied the right to exercise her religious beliefs as protected by state law and the constitution.

Defendants would suffer no harm in exempting one additional student (Cluett) with a valid religious exemption, whereas Cluett would suffer and continue to suffer the aforementioned harm outlined in the prior analysis.

Lastly, the public has an interest in ensuring that the free exercise of religion is not being prevented on its colleges and universities, along with the interests outlined in the prior analysis.

**CONCLUSION**

Plaintiffs have far exceeded the standard in demonstrating the need for preliminary injunctive relief. They have a high likelihood of success on the merits of their

20

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HUNTER HARRIS and <br> CORA CLUETT, <br> Plaintiffs <br><br> v. <br><br> UNIVERSITY OF MASSACHUSETTS <br> LOWELL, JACQUELINE MOLONEY, <br> UNIVERSITY OF MASSACHUSETTS <br> BOSTON, MARCELO SUÁREZ- <br> OROZCO and SHAWN DE VEAU <br> Defendants | ) <br> ) <br> ) <br> ) <br> )          NO. 1:21-CV-11244-DJC <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## PLAINTIFF'S PARTIAL ASSENT AND OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiffs assent to the dismissal of defendants UMass Boston and UMass Lowell, as they have not consented to Federal Court Jurisdiction.  However, plaintiffs OPPOSE the individual defendants' 12(b)(6) motion to dismiss their claims, which was supported by a combined memorandum in opposition to plaintiff's Motion for Preliminary Injunction. In this opposition memorandum, defendants failed to show that plaintiffs did not meet the pleading requirements under Fed. R. Civ. P. 8, and the basis of their Motion to Dismiss is identical to the basis for their Opposition to the merits of Plaintiffs' Motion for Preliminary Injunction, which will be heard on August 26, 2021.

1

Plaintiffs, by their attorney,

  /s/ Ryan P. McLane
Ryan P. McLane, Esq. (BBO: 697464)
McLane & McLane, LLC
269 South Westfield Street
Feeding Hills, MA 01030
Ph. (413) 789-7771
Fax (413) 789-7731
E-mail: ryan@mclanelaw.com

2

**Part I**    ADMINISTRATION OF THE GOVERNMENT

**Title XII**    EDUCATION

**Chapter 75**    UNIVERSITY OF MASSACHUSETTS

**Section 1**    STATUS; GOVERNING BODY

---

Section 1. There shall be a University of Massachusetts, consisting of campuses to be maintained at Amherst, Boston, Dartmouth, Lowell, and Worcester, which shall continue as a public institution of higher learning within the system of public higher education and shall be governed by the board of trustees established herein. In addition to the authority, responsibility, powers and duties specifically conferred by this chapter, the board of trustees shall have all authority, responsibility, rights, privileges, powers and duties customarily and traditionally exercised by governing boards of institutions of higher learning. In exercising such authority, responsibility, powers and duties said board shall not in the management of the affairs of the university be subject to, or superseded by, any other state agency, board, bureau, commission, department or officer, except as provided in section 14A of chapter 6A, sections 44 to 58, inclusive, of chapter 7C, chapter fifteen, chapter fifteen A or in this chapter. This chapter shall be liberally construed to effectuate its purposes.

A13

A14

**Part I**    ADMINISTRATION OF THE GOVERNMENT

**Title XII**    EDUCATION

**Chapter 75**    UNIVERSITY OF MASSACHUSETTS

**Section 3A** DELEGATION OF POWERS BY TRUSTEES

Section 3A. The trustees may, except as to duties imposed or powers granted under sections two, three, four and five, delegate their authority or any portion thereof to the president or other officers of the university whenever in their judgment such delegation may be necessary or desirable.

A15

# Part I    ADMINISTRATION OF THE GOVERNMENT

# Title XII    EDUCATION

# Chapter 76    SCHOOL ATTENDANCE

# Section 15   VACCINATION AND IMMUNIZATION

Section 15. No child shall, except as hereinafter provided, be admitted to school except upon presentation of a physician's certificate that the child has been successfully immunized against diphtheria, pertussis, tetanus, measles and poliomyelitis and such other communicable diseases as may be specified from time to time by the department of public health.

A child shall be admitted to school upon certification by a physician that he has personally examined such child and that in his opinion the physical condition of the child is such that his health would be endangered by such vaccination or by any of such immunizations. Such certification shall be submitted at the beginning of each school year to the physician in charge of the school health program. If the physician in charge of the school health program does not agree with the opinion of the child's physician, the matter shall be referred to the department of public health, whose decision will be final.

A16

In the absence of an emergency or epidemic of disease declared by the department of public health, no child whose parent or guardian states in writing that vaccination or immunization conflicts with his sincere religious beliefs shall be required to present said physician's certificate in order to be admitted to school.

A17

| | |
|---|---|
| **Part I** | ADMINISTRATION OF THE GOVERNMENT |
| **Title XII** | EDUCATION |
| **Chapter 76** | SCHOOL ATTENDANCE |
| **Section 15C** | IMMUNIZATION OF COLLEGE HEALTH SCIENCE STUDENTS |

Section 15C. No full-time student under thirty years of age or any full-time or part-time undergraduate or graduate students in a health science who is in contact with patients shall, except as hereinafter provided, be registered at an institution of higher education except upon presentation of a medical certificate that such student has been immunized against measles, mumps, rubella, tetanus and diphtheria; provided, however, that a student may be registered at such institution upon certification made, in writing, by a physician who has personally examined such student and in whose opinion the physical condition of such student is such that his health would be endangered by any such immunization; and provided, further, that students who have attended an elementary or secondary school in the commonwealth may submit a copy of their school immunization record, indicating receipt of the above required immunizations, in lieu of such certificate; and provided, further, that unimmunized students may be registered on the condition that the required immunizations be obtained within ten days of registration.

A18

In the absence of an emergency or epidemic of disease declared by the department of public health, no student who states in writing that such immunization would conflict with his religious beliefs shall be required to present such medical certificate in order to be admitted to such institution.

A19

**Part I**        ADMINISTRATION OF THE GOVERNMENT

**Title XVI**        PUBLIC HEALTH

**Chapter 111**        PUBLIC HEALTH

**Section 181**        ENFORCEMENT OF VACCINATION OF INHABITANTS OF TOWNS

---

Section 181. Boards of health, if in their opinion it is necessary for public health or safety, shall require and enforce the vaccination and revaccination of all the inhabitants of their towns, and shall provide them with the means of free vaccination. Whoever refuses or neglects to comply with such requirement shall forfeit five dollars.

A20

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 21. Food and Drugs (Refs & Annos)
    Chapter 9. Federal Food, Drug, and Cosmetic Act (Refs & Annos)
      Subchapter V. Drugs and Devices
        Part E. General Provisions Relating to Drugs and Devices

21 U.S.C.A. § 360bbb-3

§ 360bbb-3. Authorization for medical products for use in emergencies

Effective: December 12, 2017
Currentness

**(a) In general**

**(1) Emergency uses**

Notwithstanding any provision of this chapter and section 351 of the Public Health Service Act, and subject to the provisions of this section, the Secretary may authorize the introduction into interstate commerce, during the effective period of a declaration under subsection (b), of a drug, device, or biological product intended for use in an actual or potential emergency (referred to in this section as an "emergency use").

**(2) Approval status of product**

An authorization under paragraph (1) may authorize an emergency use of a product that--

**(A)** is not approved, licensed, or cleared for commercial distribution under section 355, 360(k), 360b, or 360e of this title or section 351 of the Public Health Service Act or conditionally approved under section 360ccc of this title (referred to in this section as an "unapproved product"); or

**(B)** is approved, conditionally approved under section 360ccc of this title, licensed, or cleared under such a provision, but which use is not under such provision an approved, conditionally approved under section 360ccc of this title, licensed, or cleared use of the product (referred to in this section as an "unapproved use of an approved product").

**(3) Relation to other uses**

An emergency use authorized under paragraph (1) for a product is in addition to any other use that is authorized for the product under a section of this chapter or the Public Health Service Act referred to in paragraph (2)(A).

**(4) Definitions**

A21

For purposes of this section:

**(A)** The term "biological product" has the meaning given such term in section 351 of the Public Health Service Act.

**(B)** The term "emergency use" has the meaning indicated for such term in paragraph (1).

**(C)** The term "product" means a drug, device, or biological product.

**(D)** The term "unapproved product" has the meaning indicated for such term in paragraph (2)(A).

**(E)** The term "unapproved use of an approved product" has the meaning indicated for such term in paragraph (2)(B).

**(b) Declaration of emergency or threat justifying emergency authorized use**

**(1) In general**

The Secretary may make a declaration that the circumstances exist justifying the authorization under this subsection for a product on the basis of--

**(A)** a determination by the Secretary of Homeland Security that there is a domestic emergency, or a significant potential for a domestic emergency, involving a heightened risk of attack with a biological, chemical, radiological, or nuclear agent or agents;

**(B)** a determination by the Secretary of Defense that there is a military emergency, or a significant potential for a military emergency, involving a heightened risk to United States military forces, including personnel operating under the authority of Title 10 or Title 50, of attack with--

**(i)** a biological, chemical, radiological, or nuclear agent or agents; or

**(ii)** an agent or agents that may cause, or are otherwise associated with, an imminently life-threatening and specific risk to United States military forces;

**(C)** a determination by the Secretary that there is a public health emergency, or a significant potential for a public health emergency, that affects, or has a significant potential to affect, national security or the health and security of United States citizens living abroad, and that involves a biological, chemical, radiological, or nuclear agent or agents, or a disease or condition that may be attributable to such agent or agents; or

**(D)** the identification of a material threat pursuant to section 319F-2 of the Public Health Service Act sufficient to affect national security or the health and security of United States citizens living abroad.

A22

**(2) Termination of declaration**

**(A) In general**

A declaration under this subsection shall terminate upon the earlier of--

**(i)** a determination by the Secretary, in consultation as appropriate with the Secretary of Homeland Security or the Secretary of Defense, that the circumstances described in paragraph (1) have ceased to exist; or

**(ii)** a change in the approval status of the product such that the circumstances described in subsection (a)(2) have ceased to exist.

**(B) Disposition of product**

If an authorization under this section with respect to an unapproved product ceases to be effective as a result of a termination under subparagraph (A) of this paragraph, the Secretary shall consult with the manufacturer of such product with respect to the appropriate disposition of the product.

**(3) Advance notice of termination**

The Secretary shall provide advance notice that a declaration under this subsection will be terminated. The period of advance notice shall be a period reasonably determined to provide--

**(A)** in the case of an unapproved product, a sufficient period for disposition of the product, including the return of such product (except such quantities of product as are necessary to provide for continued use consistent with subsection (f)(2)) to the manufacturer (in the case of a manufacturer that chooses to have such product returned); and

**(B)** in the case of an unapproved use of an approved product, a sufficient period for the disposition of any labeling, or any information under subsection (e)(2)(B)(ii), as the case may be, that was provided with respect to the emergency use involved.

**(4) Publication**

The Secretary shall promptly publish in the Federal Register each declaration, determination, and advance notice of termination under this subsection.

**(5) Explanation by Secretary**

If an authorization under this section with respect to an unapproved product or an unapproved use of an approved product has been in effect for more than 1 year, the Secretary shall provide in writing to the sponsor of such product an explanation

of the scientific, regulatory, or other obstacles to approval, licensure, or clearance of such product or use, including specific actions to be taken by the Secretary and the sponsor to overcome such obstacles.

**(6) Military emergencies**

In the case of a determination described in paragraph (1)(B), the Secretary shall determine, within 45 calendar days of such determination, whether to make a declaration under paragraph (1), and, if appropriate, shall promptly make such a declaration.

**(c) Criteria for issuance of authorization**

The Secretary may issue an authorization under this section with respect to the emergency use of a product only if, after consultation with the Assistant Secretary for Preparedness and Response, the Director of the National Institutes of Health, and the Director of the Centers for Disease Control and Prevention (to the extent feasible and appropriate given the applicable circumstances described in subsection (b)(1)), the Secretary concludes--

**(1)** that an agent referred to in a declaration under subsection (b) can cause a serious or life-threatening disease or condition;

**(2)** that, based on the totality of scientific evidence available to the Secretary, including data from adequate and well-controlled clinical trials, if available, it is reasonable to believe that--

**(A)** the product may be effective in diagnosing, treating, or preventing--

**(i)** such disease or condition; or

**(ii)** a serious or life-threatening disease or condition caused by a product authorized under this section, approved or cleared under this chapter, or licensed under section 351 of the Public Health Service Act, for diagnosing, treating, or preventing such a disease or condition caused by such an agent; and

**(B)** the known and potential benefits of the product, when used to diagnose, prevent, or treat such disease or condition, outweigh the known and potential risks of the product, taking into consideration the material threat posed by the agent or agents identified in a declaration under subsection (b)(1)(D), if applicable;

**(3)** that there is no adequate, approved, and available alternative to the product for diagnosing, preventing, or treating such disease or condition;

**(4)** in the case of a determination described in subsection (b)(1)(B)(ii), that the request for emergency use is made by the Secretary of Defense; and

**(5)** that such other criteria as the Secretary may by regulation prescribe are satisfied.

**(d) Scope of authorization**

An authorization of a product under this section shall state--

**(1)** each disease or condition that the product may be used to diagnose, prevent, or treat within the scope of the authorization;

**(2)** the Secretary's conclusions, made under subsection (c)(2)(B), that the known and potential benefits of the product, when used to diagnose, prevent, or treat such disease or condition, outweigh the known and potential risks of the product; and

**(3)** the Secretary's conclusions, made under subsection (c), concerning the safety and potential effectiveness of the product in diagnosing, preventing, or treating such diseases or conditions, including, to the extent practicable given the circumstances of the emergency, an assessment of the available scientific evidence.

**(e) Conditions of authorization**

**(1) Unapproved product**

**(A) Required conditions**

With respect to the emergency use of an unapproved product, the Secretary, to the extent practicable given the applicable circumstances described in subsection (b)(1), shall, for a person who carries out any activity for which the authorization is issued, establish such conditions on an authorization under this section as the Secretary finds necessary or appropriate to protect the public health, including the following:

**(i)** Appropriate conditions designed to ensure that health care professionals administering the product are informed--

**(I)** that the Secretary has authorized the emergency use of the product;

**(II)** of the significant known and potential benefits and risks of the emergency use of the product, and of the extent to which such benefits and risks are unknown; and

**(III)** of the alternatives to the product that are available, and of their benefits and risks.

**(ii)** Appropriate conditions designed to ensure that individuals to whom the product is administered are informed--

**(I)** that the Secretary has authorized the emergency use of the product;

**(II)** of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and

A25

**(III)** of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.

**(iii)** Appropriate conditions for the monitoring and reporting of adverse events associated with the emergency use of the product.

**(iv)** For manufacturers of the product, appropriate conditions concerning recordkeeping and reporting, including records access by the Secretary, with respect to the emergency use of the product.

**(B) Authority for additional conditions**

With respect to the emergency use of an unapproved product, the Secretary may, for a person who carries out any activity for which the authorization is issued, establish such conditions on an authorization under this section as the Secretary finds necessary or appropriate to protect the public health, including the following:

**(i)** Appropriate conditions on which entities may distribute the product with respect to the emergency use of the product (including limitation to distribution by government entities), and on how distribution is to be performed.

**(ii)** Appropriate conditions on who may administer the product with respect to the emergency use of the product, and on the categories of individuals to whom, and the circumstances under which, the product may be administered with respect to such use.

**(iii)** Appropriate conditions with respect to collection and analysis of information concerning the safety and effectiveness of the product with respect to the use of such product during the period when the authorization is in effect and a reasonable time following such period.

**(iv)** For persons other than manufacturers of the product, appropriate conditions concerning recordkeeping and reporting, including records access by the Secretary, with respect to the emergency use of the product.

**(2) Unapproved use**

With respect to the emergency use of a product that is an unapproved use of an approved product:

**(A)** For a person who carries out any activity for which the authorization is issued, the Secretary shall, to the extent practicable given the applicable circumstances described in subsection (b)(1), establish conditions described in clauses (i) and (ii) of paragraph (1)(A), and may establish conditions described in clauses (iii) and (iv) of such paragraph or in paragraph (1)(B).

**(B)(i)** If the authorization under this section regarding the emergency use authorizes a change in the labeling of the product, but the manufacturer of the product chooses not to make such change, such authorization may not authorize distributors of

A26

the product or any other person to alter or obscure the labeling provided by the manufacturer, except as provided in section 360bbb-3a of this title with respect to authorized changes to the product expiration date.

**(ii)** In the circumstances described in clause (i), for a person who does not manufacture the product and who chooses to act under this clause, an authorization under this section regarding the emergency use shall, to the extent practicable given the circumstances of the emergency, authorize such person to provide appropriate information with respect to such product in addition to the labeling provided by the manufacturer, subject to compliance with clause (i). While the authorization under this section is effective, such additional information shall not be considered labeling for purposes of section 352 of this title.

**(C)** In establishing conditions under this paragraph with respect to the distribution and administration of the product for the unapproved use, the Secretary shall not impose conditions that would restrict distribution or administration of the product when distributed or administered for the approved use.

### (3) Good manufacturing practice; prescription

With respect to the emergency use of a product for which an authorization under this section is issued (whether an unapproved product or an unapproved use of an approved product), the Secretary may waive or limit, to the extent appropriate given the applicable circumstances described in subsection (b)(1)--

**(A)** requirements regarding current good manufacturing practice otherwise applicable to the manufacture, processing, packing, or holding of products subject to regulation under this chapter, including such requirements established under section 351 or 360j(f)(1) of this title, and including relevant conditions prescribed with respect to the product by an order under section 360j(f)(2) of this title;

**(B)** requirements established under subsection (b) or (f) of section 353 of this title or under section 354 of this title; and

**(C)** requirements established under section 360j(e) of this title.

### (4) Advertising

The Secretary may establish conditions on advertisements and other promotional descriptive printed matter that relate to the emergency use of a product for which an authorization under this section is issued (whether an unapproved product or an unapproved use of an approved product), including, as appropriate--

**(A)** with respect to drugs and biological products, requirements applicable to prescription drugs pursuant to section 352(n) of this title; or

**(B)** with respect to devices, requirements applicable to restricted devices pursuant to section 352(r) of this title.

### (f) Duration of authorization

**(1) In general**

Except as provided in paragraph (2), an authorization under this section shall be effective until the earlier of the termination of the declaration under subsection (b) or a revocation under subsection (g).

**(2) Continued use after end of effective period**

Notwithstanding the termination of the declaration under subsection (b) or a revocation under subsection (g), an authorization shall continue to be effective to provide for continued use of an unapproved product with respect to a patient to whom, or an animal to which, it was administered during the period described by paragraph (1), to the extent found necessary by such patient's attending physician or by the veterinarian caring for such animal, as applicable.

**(g) Review and revocation of authorization**

**(1) Review**

The Secretary shall periodically review the circumstances and the appropriateness of an authorization under this section. As part of such review, the Secretary shall regularly review the progress made with respect to the approval, conditional approval under section 360ccc of this title, licensure, or clearance of--

**(A)** an unapproved product for which an authorization was issued under this section; or

**(B)** an unapproved use of an approved product for which an authorization was issued under this section.

**(2) Revision and revocation**

The Secretary may revise or revoke an authorization under this section if--

**(A)** the circumstances described under subsection (b)(1) no longer exist;

**(B)** the criteria under subsection (c) for issuance of such authorization are no longer met; or

**(C)** other circumstances make such revision or revocation appropriate to protect the public health or safety.

**(h) Publication; confidential information**

**(1) Publication**

The Secretary shall promptly publish in the Federal Register a notice of each authorization, and each termination or revocation of an authorization under this section, and an explanation of the reasons therefor (which may include a summary of data or

information that has been submitted to the Secretary in an application under section 355(i) [1] 360b(j), or 360j(g) of this title, even if such summary may indirectly reveal the existence of such application). The Secretary shall make any revisions to an authorization under this section available on the Internet Web site of the Food and Drug Administration.

**(2) Confidential information**

Nothing in this section alters or amends section 1905 of Title 18 or section 552(b)(4) of Title 5.

**(i) Actions committed to agency discretion**

Actions under the authority of this section by the Secretary, by the Secretary of Defense, or by the Secretary of Homeland Security are committed to agency discretion.

**(j) Rules of construction**

The following applies with respect to this section:

**(1)** Nothing in this section impairs the authority of the President as Commander in Chief of the Armed Forces of the United States under article II, section 2 of the United States Constitution.

**(2)** Nothing in this section impairs the authority of the Secretary of Defense with respect to the Department of Defense, including the armed forces, under other provisions of Federal law.

**(3)** Nothing in this section (including any exercise of authority by a manufacturer under subsection (e)(2)) impairs the authority of the United States to use or manage quantities of a product that are owned or controlled by the United States (including quantities in the stockpile maintained under section 319F-2 of the Public Health Service Act.

**(4)** Nothing in this section shall be construed as authorizing a delay in the review or other consideration by the Secretary of any application or submission pending before the Food and Drug Administration for a product for which an authorization under this section is issued.

**(k) Relation to other provisions**

If a product is the subject of an authorization under this section, the use of such product within the scope of the authorization shall not be considered to constitute a clinical investigation for purposes of section 355(i), 360b(j), or 360j(g) of this title or any other provision of this chapter or section 351 of the Public Health Service Act.

**(l) Option to carry out authorized activities**

Nothing in this section provides the Secretary any authority to require any person to carry out any activity that becomes lawful pursuant to an authorization under this section, and no person is required to inform the Secretary that the person will not be carrying out such activity, except that a manufacturer of a sole-source unapproved product authorized for emergency use shall

A29

report to the Secretary within a reasonable period of time after the issuance by the Secretary of such authorization if such manufacturer does not intend to carry out any activity under the authorization. This section only has legal effect on a person who carries out an activity for which an authorization under this section is issued. This section does not modify or affect activities carried out pursuant to other provisions of this chapter or section 351 of the Public Health Service Act. Nothing in this subsection may be construed as restricting the Secretary from imposing conditions on persons who carry out any activity pursuant to an authorization under this section.

**(m) Categorization of laboratory tests associated with devices subject to authorization**

**(1) In general**

In issuing an authorization under this section with respect to a device, the Secretary may, subject to the provisions of this section, determine that a laboratory examination or procedure associated with such device shall be deemed, for purposes of section 353 of the Public Health Service Act, to be in a particular category of examinations and procedures (including the category described by subsection (d)(3) of such section) if, based on the totality of scientific evidence available to the Secretary--

**(A)** such categorization would be beneficial to protecting the public health; and

**(B)** the known and potential benefits of such categorization under the circumstances of the authorization outweigh the known and potential risks of the categorization.

**(2) Conditions of determination**

The Secretary may establish appropriate conditions on the performance of the examination or procedure pursuant to such determination.

**(3) Effective period**

A determination under this subsection shall be effective for purposes of section 353 of the Public Health Service Act notwithstanding any other provision of that section during the effective period of the relevant declaration under subsection (b).

**CREDIT(S)**

(June 25, 1938, c. 675, § 564, as added Pub.L. 108-136, Div. A, Title XVI, § 1603(a), Nov. 24, 2003, 117 Stat. 1684; amended Pub.L. 108-276, § 4(a), July 21, 2004, 118 Stat. 853; Pub.L. 113-5, Title III, § 302(a), Mar. 13, 2013, 127 Stat. 179; Pub.L. 114-255, Div. A, Title III, § 3088(a), Dec. 13, 2016, 130 Stat. 1148; Pub.L. 115-92, § 1(a), Dec. 12, 2017, 131 Stat. 2023.)

**MEMORANDA OF PRESIDENT**

**PRESIDENTIAL MEMORANDUM**

<March 11, 2020, 85 FR 15049>

**Making General Use Respirators Available**

Memorandum for the Secretary of Health and Human Services [and] the Secretary of Labor

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

It is the policy of the United States to take proactive measures to prepare for and respond to public health threats, including the public health emergency involving Coronavirus Disease 2019 (COVID-19), which was declared by the Secretary of Health and Human Services on February 4, 2020, pursuant to section 564 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 360bbb-3). We must ensure that our healthcare providers have full access to the products they need. On March 10, 2020, the Secretary of Health and Human Services took action by issuing a declaration pursuant to section 319F-3 of the Public Health Service Act (42 U.S.C. 247d-6d), which will help bring products necessary for addressing the epidemic to healthcare providers across the Nation. Unfortunately, at present, public health experts anticipate shortages in the supply of personal respiratory devices (respirators) available for use by healthcare workers in mitigating further transmission of COVID-19.

To help prevent the spread of COVID-19, the Secretary of Health and Human Services shall take all appropriate and necessary steps with respect to general use respirators to facilitate their emergency use by healthcare personnel in healthcare facilities and elsewhere, including under the authorities granted by section 319F-3 of the Public Health Service Act (42 U.S.C. 247d-6d) and section 564 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 360bbb-3). Additionally, the Secretary of Labor shall consider all appropriate and necessary steps to increase the availability of respirators.

The Secretary of Health and Human Services is authorized and directed to publish this memorandum in the Federal Register.

DONALD J. TRUMP

**Footnotes**

1        So in original. Probably should be followed by a comma.

21 U.S.C.A. § 360bbb-3, 21 USCA § 360bbb-3

Current through P.L. 117-80. Some statute sections may be more current, see credits for details.

---

**End of Document**                                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.   A31